## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT is made and entered into as of August 2, 2006, by and among Theragenics Corporation, a Delaware corporation ("*Purchaser*"), James R. Eddings, a resident of the State of Texas ("*Eddings*") and those shareholders of Galt Medical Corp., a Texas corporation (the "*Company*") listed on Schedule 1 hereto (together with Eddings, "*Shareholders*") and holders of Company Stock Derivatives (as defined in Section 1.01) listed on Schedule 1 hereto (together with Shareholders, "*Sellers*"), and Eddings as Sellers' Representative pursuant to Section 5.05 hereof. Capitalized terms not otherwise defined herein have the meanings set forth in Article I.

## RECITALS

As of the date hereof, the Sellers are the beneficial owners of one hundred percent (100%) of the issued and outstanding capital stock of the Company and Company Stock Derivatives.

Pursuant to this Agreement, Sellers shall sell, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, for the consideration and on the terms set forth in this Agreement, (i) the shares of common stock of the Company, $0.10 par value (the "*Company Shares*") set forth opposite the name of each Seller on Schedule 1 hereto, which Company Shares represent one hundred percent (100%) of the issued and outstanding capital stock of the Company, and (ii) Company Stock Derivatives set forth opposite the name of each Seller on Schedule 1 hereto, which Company Stock Derivatives represent one hundred percent (100%) of the aggregate outstanding Company Stock Derivatives.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Definitions and Construction.

(a)    Certain Defined Terms.  For purposes of this Agreement, the following terms shall have the respective meanings set forth below.  All other capitalized terms, when used in this Agreement, shall have the respective meanings assigned to them where they first appear and are defined in this Agreement.

"*Action or Proceeding*" means any action, suit, litigation, proceeding, mediation, arbitration or Governmental Entity investigation or audit.

"*Affiliate*", with respect to any Person, means any other Person that controls, is controlled by or is under common control with the first Person.

1

"*Agreement*" means this Stock Purchase Agreement, together with all Schedules and Exhibits attached hereto and referenced herein.

"*Ancillary Agreements*" means, collectively, the Eddings Employment and Non-Competition Agreement, the Angela Walters Employment and Non-Competition Agreement, the David Catlin Employment and Non-Competition Agreement, the David Ozinga Employment and Non-Competition Agreement, the Lauren Hart Employment and Non-Competition Agreement, the Frank Gerome Employment and Non-Competition Agreement, the Escrow Agreement, the Registration Rights Agreement, the Form of Intellectual Property Assignment Agreement, the Landlord Consent and all other support agreements and other agreements to be entered into in connection with the transactions contemplated by this Agreement.

"*Assets and Properties*" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, operated, owned, leased or licensed by such Person, including Investment Assets, accounts and notes receivable, chattel paper, documents, instruments, licenses, Contracts, general intangibles, real estate, equipment, inventory, goods and Intellectual Property.

"*Associate*", with respect to any Person, means any corporation or other business organization of which such Person is an officer or partner or is the beneficial owner, directly or indirectly, of ten percent (10%) or more of any class of equity securities, any trust or estate in which such Person has a substantial beneficial interest or as to which such Person serves as a trustee or in a similar capacity, the spouse of such Person, or any relative of such Person or spouse, who shares the same primary residence as such Person.

"*Audited Financial Statements*" has the meaning ascribed to it in Section 3.06.

"*Benefit Plan*" means any written and any unwritten bonus, incentive compensation, deferred compensation, pension, profit sharing, retirement, savings, stock purchase, stock option, restricted stock, stock grant, stock ownership, stock appreciation rights, phantom stock, leave of absence, layoff, vacation, day care, dependent care, legal services, cafeteria, life insurance, health, accident, disability, worker's compensation or other insurance, severance, separation, welfare or other employee benefit plan, practice, policy, agreement or arrangement of any kind, whether written or oral, including any "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"*Books and Records*" of any Person means all files, documents, instruments, papers, books and records relating to the business, operations, condition (financial or other), results of operations and Assets and Properties of such Person, including financial statements, Tax Returns and related work papers and letters from accountants, budgets, pricing guidelines, sales and promotional literature, sales and purchase correspondence, ledgers, journals, deeds, title policies, personnel and employment records, Contracts, Licenses, customer and supplier lists, telephone and facsimile numbers, computer files and programs, retrieval programs, operating data and plans and environmental studies and plans.

2

*"Business"* means the business of manufacturing, selling and distributing medical products and devices of the Company and any other activities performed by the Company on the date hereof.

*"Business Contracts"* means all Contracts (other than the Real Property Leases and the Personal Property Leases) to which the Company is a party and which are used or held for use by the Company primarily in, or are necessary for, the conduct of the Business as a going concern, including purchase orders and Contracts related to customers, suppliers, sales representatives, distributors, marketing, manufacturing and testing.

*"Business Day"* means any day on which the principal offices of the SEC in Washington, D.C. are open to accept filings, or, in the case of determining a date when any payment is due, any day on which banks are not required or authorized by Law or executive order to close in the State of Georgia.

*"Business Licenses"* means all Licenses (including applications therefor), to the extent transferable, which are used or held for use by the Company primarily in, or are necessary for, the conduct of the Business as a going concern.

*"CERCLA"* has the meaning ascribed to it in Section 1.01(a), under "Environmental Law."

*"Certificates"* has the meaning ascribed to it in Section 2.02.

*"Claim"* has the meaning ascribed to it in Section 7.04(a).

*"Closing"* has the meaning ascribed to it in Section 2.05.

*"Closing Date"* has the meaning ascribed to it in Section 2.05.

*"COBRA"* has the meaning ascribed to it in Section 3.16(j).

*"Company"* means Galt Medical Corp., a Texas corporation.

*"Company Authorizations"* has the meaning ascribed to it in Section 3.12.

*"Company Intellectual Property"* means all the Intellectual Property that is used or useful in, or is necessary for, the conduct of the Business as a going concern (including the Company's goodwill therein) as conducted within the twelve (12) month period prior to the date hereof.

*"Company Stock Derivatives"* means all equity interests in the Company other than Company Shares, all rights to receive equity interests in the Company, all rights to receive payments that are derivative of the value of equity interests in the Company, and all promises to issue any of the foregoing, whether written or unwritten, including without limitation, phantom stock, options, warrants, other derivatives and promises to issue any of the foregoing.

3

"*Company Shares*" means the issued and outstanding common stock of the Company.

"*Company's Plans*" has the meaning ascribed to it in Section 3.16(d).

"*Confidentiality Agreement*" means that certain Confidentiality Agreement dated January 17, 2006 between Purchaser and the Company.

"*Contract*" means any agreement, lease, license, evidence of Indebtedness, mortgage, indenture, security agreement or other contract or arrangement (whether written or oral) setting forth a legal obligation or right of a party thereto with respect to the subject matter thereof (including all amendments, supplements thereto, restatements thereof and consents, waivers and notices thereunder which affect the rights and/or obligations of any of the parties thereto).

"*Disclosure Schedule*" has the meaning ascribed to it in the introductory paragraph of Article III.

"*Dispute*" has the meaning ascribed to it in Section 8.09.

"*$*" or "*Dollars*" means United States dollars.

"*Employees*" means all employees of the Company employed in connection with the Business as of the date of this Agreement.

"*Encumbrance*" means any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, charge, right of first refusal or other encumbrance, right or restriction of any kind, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"*Environmental Claim*" means any action, suit, complaint, notice of violation, demand, penalty, written or oral notice, request for information or other communication, claim, investigation, order or proceeding relating to: (i) the actual or alleged violation of any Environmental Law, including, without limitation, any alleged failure to possess or comply with any environmental approvals, permits, licenses, clearances and consents required under any Environmental Law; (ii) any treatment, storage, recycling, transportation, disposal, handling, placement, Release or threatened Release, or the presence of any Hazardous Material at any location, whether or not owned by the Person against whom such liability is alleged or asserted; or (iii) the actual or alleged exposure of any Person to any Hazardous Material.

"*Environmental Law*" means any Law or rule of common law (including, without limitation, nuisance and trespass claims) of any Governmental Entity, relating to human health, safety, any Hazardous Material, natural resources or the environment (including, without limitation, ground, air, water or noise pollution or contamination, and underground or above-ground storage tanks), and shall include, without limitation, the Solid Waste Disposal Act, 42 U.S.C. § 6901 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq. ("*CERCLA*"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("*SARA*"); the Hazardous Materials Transportation Act, 49

4

U.S.C. § 1801 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., and their state equivalents or analogs, and any other state or federal environmental statutes, and all rules, regulations, orders and decrees now or hereafter promulgated under any of the foregoing, as any of the foregoing now exist or may be changed or amended or come into effect in the future.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"*ERISA Affiliate*" has the meaning ascribed to it in Section 3.16(g).

"*Escrow Agent*" has the meaning ascribed to it in Section 7.02.

"*Escrow Agreement*" has the meaning ascribed to it in Section 2.04.

"*Escrow Amount*" has the meaning ascribed to it in Section 2.04.

"*Escrow Fund*" has the meaning ascribed to it in Section 7.02.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder, as in effect from time to time.

"*Expenses*" means, with respect to any party hereto, all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, experts and consultants) reasonably incurred by or on behalf of such party in connection with or related to the negotiation, authorization, preparation, execution and performance of its obligations pursuant to this Agreement, the Ancillary Agreements and the consummation of the transactions contemplated hereby, and all other matters and proceedings related to this Agreement, the Ancillary Agreements, the transactions contemplated hereby and thereby and the closing of such transactions.

"*GAAP*" means accounting principles generally accepted in the United States of America, consistently applied throughout the specified period and in the immediately preceding comparable period.

"*Governmental Entity*" means any United States federal, state or local and any foreign governmental, regulatory or administrative authority, agency, commission, court, tribunal or arbitral body.

"*Gross Shares*" means a number of shares of Purchaser Common Stock with an aggregate dollar value valued at the Purchaser Average Stock Price equal to Three Million One Hundred Eighty Five Thousand Five Hundred Fifty Seven and 21/100 Dollars ($3,185,557.21) and issued on the Closing Date to those Sellers who qualify as an "accredited investor" within the meaning of Rule 501 of the Securities Act, in the amount set forth opposite the name of each such Seller on Schedule 1 hereto.

5

"*Hazardous Material*" means any material or substance, whether solid, liquid or gaseous: (i) which is listed, regulated or defined as a "hazardous substance," "hazardous waste," "hazardous material," "regulated substance," "toxic substance," "contaminant," "pollutant" or "solid waste," or otherwise classified or regulated as hazardous or toxic, in or pursuant to any Environmental Law, or for which a Person may be subject to liability under any Environmental Law; (ii) which is or contains asbestos, lead-based paint, radon, any polychlorinated biphenyl, polybrominated diphenyl ether, urea formaldehyde foam insulation, explosive or radioactive material, motor fuel, or petroleum (including, without limitation, petroleum products, by-products, constituents or other petroleum hydrocarbons), fungi, bacterial or viral matter which reproduces through the release of spores or the splitting of cells or other means, (including without limitation, mold, toxic or mycotoxin spores); or (iii) which causes a contamination or nuisance on, in, at, under, around or affecting any property or a hazard, or threat of the same, to public health, human health or the environment.

"*Indebtedness*" of any Person means all obligations of such Person (i) for borrowed money, whether or not evidenced by notes, bonds, debentures or similar instruments; (ii) for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the ordinary course of business); (iii) under capital leases; and (iv) in the nature of guarantees of the obligations described in clauses (i) through (iii) above of any other Person.

"*Indemnified Parties*" has the meaning ascribed to it in Section 7.03(a).

"*Indemnitee*" has the meaning ascribed to it in Section 7.04(a).

"*Indemnitor*" has the meaning ascribed to it in Section 7.04(a).

"*Intangible Personal Property*" means all Intellectual Property of the Company, including the items listed in Section 3.13(h) of the Disclosure Schedule, and all Intellectual Property of the Company related to Product-Specific Machinery and Equipment.

"*Intellectual Property*" means any or all of the following, and all rights in, to, under, arising out of, or associated with any or all of the following: (i) all United States, foreign and international patents and patent rights (including all patents, patent applications, and any and all divisions, continuations, continuations-in-part, reissues, re-examinations and extensions thereof, and all invention registrations and invention disclosures); (ii) all trademarks and trademark rights, service marks and service mark rights, trade names and trade name rights, service names and service name rights (including all goodwill, common law rights and governmental or other registrations or applications for registration pertaining thereto), designs, trade dress, brand names, business and product names, Internet domain names, logos and slogans; (iii) all copyrightable works and copyright rights therein (including all common law rights and governmental or other registrations or applications for registration pertaining thereto, and renewal rights therefor); (iv) all *sui generis* database rights, ideas, inventions, (whether patentable or not), invention disclosures, improvements, technology, know-how, show-how, formulas, systems, processes, designs, methodologies, industrial models, works of authorship, technical drawings, statistical models, algorithms, modules, computer programs, technical documentation, business methods, work product, intellectual and industrial property licenses, proprietary information, and customer lists; (v) all mask works, mask work registrations and

6

applications therefor; (vi) all industrial designs and any registrations and applications therefor throughout the world; (vii) all computer software including all source code, object code, firmware, development tools, files, records and data, and all media on which any of the foregoing is recorded; (viii) all shop rights and moral rights, (ix) all trade secrets, trade secret rights, and other proprietary rights in information, including contractual or other rights to confidential information of third parties or to have information treated as confidential by third parties; (x) all similar, corresponding or equivalent rights to, and to the benefits pertaining to, any of the foregoing, including (without limitation), the right to institute, prosecute, defend, and/or prosecute all suits and proceedings and retain all damage and other awards and to take all actions necessary or proper to collect, assert, or enforce any interest, claim, right, or title of any kind in and to any and all of the foregoing, or the Assets and Properties; and (xi) all documentation related to any of the foregoing; *provided, however,* that the term "*Intellectual Property*" does not include any of the foregoing to the extent that the rights thereto are in the public domain and not subject to ownership or proprietary rights on the part of any party.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"*Inventory*" means all inventory of goods and supplies used or maintained in connection with the Business, including medical supplies and office supplies, whether as finished product, raw material or work in progress, and whether held at, or in transit from or to, the locations at which the Business is conducted.

"*Investment Assets*" means all debentures, notes and other evidences of Indebtedness, stocks, securities (including rights to purchase and securities convertible into or exchangeable for other securities), interests in joint ventures and general and limited partnerships, mortgage loans and other investment or portfolio assets owned of record or beneficially by the Company (other than trade receivables generated in the ordinary course of business of the Company).

"*IRS*" means the United States Internal Revenue Service.

"*Law*" means any U.S. federal, state, or local, and any foreign, statute, law, ordinance, regulation, rule, code, order, judgment, decree, or other requirement or rule of law, as in effect from time to time, including the Foreign Corrupt Practices Act.

"*Legal Expenses*" of Indemnified Parties means any and all reasonable out-of-pocket fees, costs and expenses of any kind incurred by such Indemnified Parties and its counsel in investigating, preparing for, defending against, providing evidence, producing documents or responding to subpoenas in connection with, or taking other action with respect to any threatened or asserted claim or investigation of a third party or Governmental Entity, including expenses of investigation, court costs, and fees and expenses of attorneys, accountants and experts.

"*Liability*" and "*Liabilities*" means any Indebtedness, obligation or other liability of a Person (whether absolute, accrued, contingent, fixed or otherwise, matured or unmatured, determined or undetermined, or whether due or to become due).

7

"*License*" means any license, permit, certificate of authority, authorization, approval, registration, franchise and similar consent granted or issued by any Governmental Entity.

"*Loss*" has the meaning ascribed to it in Section 7.03(a).

"*Material Adverse Effect*" with respect to the specified Person means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate with all other such changes, effects, events, occurrences, states of fact and developments, is, or would reasonably be expected to be, materially adverse to the business, assets, Liabilities, financial condition, operations, or results of operations of the specified Person; *provided, however,* that none of the following shall be deemed in itself to constitute a Material Adverse Effect: changes, effects, events, occurrences, states of facts or developments (A) occurring as a result of general economic or financial conditions, or (B) which, in the case of the Business, are not unique to the Business, but also affect other Persons who participate or are engaged in the businesses comparable to the Business, and, in the case of Purchaser, are not unique to Purchaser, but also affect other Persons who participate or are engaged in the businesses conducted by Purchaser, to the extent, in each case, that such changes, events, occurrences, states of fact or developments do not have a materially disproportionate effect on the Business (in the case of provisions relating to the Business) or on Purchaser (in the case of provisions relating to Purchaser).

"*Notice*" has the meaning ascribed to it in Section 7.04(a).

"*Order*" means any writ, judgment, decree, notice, ruling, opinion, stipulation, determination, injunction or similar order or award of any arbitrator, mediator or Governmental Entity (in each such case whether preliminary or final).

"*Payment Programs*" means any payment program, including without limitation Medicare, TRICARE, Medicaid, worker's compensation, Blue Cross/Blue Shield programs, managed care plans, health maintenance organizations, preferred provider organizations, health benefit plans, health insurance plans, employee benefit plans, government sponsored programs, alternative care plans, and other third party reimbursement and payment programs.

"*Permitted Encumbrance*" means (i) any Encumbrance for Taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP; or (ii) any statutory Encumbrance arising in the ordinary course of business by operation of Law with respect to a Liability that is not yet due and payable and does not materially impair the value of the property subject to such Encumbrance or the use of such property in the conduct of the Business.

"*Person*" means an individual, corporation, partnership, limited partnership, limited liability company, limited liability partnership, syndicate, person (including a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association, entity or Governmental Entity.

"*Personal Property Leases*" means (i) the leases or subleases of Tangible Personal Property described in Section 3.25(a) of the Disclosure Schedule as to which the Company is the lessor or sublessor, and (ii) the leases of Tangible Personal Property described in

8

Section 3.25(a) of the Disclosure Schedule as to which the Company is the lessee or sublessee, together with any options to purchase the underlying property.

"*Pricing Period*" means the forty (40) trading days ending on two trading days immediately prior to (and not including) the execution date of this Agreement.

"*Product-Specific Machinery and Equipment*" has the meaning ascribed to it in the definition for "*Tangible Personal Property*".

"*Purchase Price*" has the meaning ascribed to it in Section 2.03.

"*Purchaser*" means Theragenics Corporation, a Delaware corporation.

"*Purchaser Average Stock Price*" means the arithmetic average of the closing price for a share of Purchaser Common Stock as quoted on the New York Stock Exchange for each trading day during the Pricing Period.

"*Purchaser Common Stock*" means the common stock, par value $.01 per share, of Purchaser.

"*Purchaser SEC Reports*" has the meaning ascribed to it in Section 4.05(a).

"*Rate*" has the meaning ascribed to it in Section 7.03(a).

"*Real Property Leases*" means (i) the leases and subleases of real property with respect to the Company's facilities which are described in Section 3.25(a) of Disclosure Schedule as to which the Company is the lessor or sublessor, and (ii) the leases and subleases of real property described in Section 3.25(a) of the Disclosure Schedule as to which the Company is the lessee or sublessee, together with any options to purchase the underlying property and leasehold improvements thereon, and in each case all other rights, subleases, licenses, permits and profits appurtenant to or related to such leases and subleases.

"*Registrable Securities*" has the meaning ascribed to it in Section 2.08.

"*Registration Rights Agreement*" has the meaning ascribed to it in Section 2.08.

"*Release*" means any past or present release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, depositing, escaping, injecting, leaching, dispersing, seeping, migrating, filtering, dumping, disposing, injecting or other releasing into the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater, and surface or subsurface strata) or into or out of any property, whether intentional or unintentional, including, without limitation, the movement of Hazardous Material on, in, under, above, about, through or into the air, soil, surface water, or groundwater.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder, as in effect from time to time.

9

"*Sellers*" has the meaning ascribed to it in the introductory paragraph of this Agreement.

"*Sellers' Representative*" has the meaning ascribed to it in Section 5.05.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, limited partnership, limited liability company, limited liability partnership, joint venture or other legal entity, a majority of the stock or other equity interests or voting power of which is owned, directly or indirectly, by such Person (either alone or through or together with any other subsidiary of such Person).

"*Tangible Personal Property*" means all furniture, fixtures, vehicles, machinery, equipment, tools (including machinery and equipment designed exclusively for products of the Business) ("*Product-Specific Machinery and Equipment*") computers (including computer hardware and software) and other tangible personal property and all replacement parts therefor which are used or held for use by the Company primarily in, or are necessary for, the conduct of the Business as a going concern, and including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person and including Product-Specific Machinery and Equipment owned or leased by the Company and located at locations where products of the Business are manufactured or tested.

"*Tax*" means (i) any and all taxes, fees, levies, duties, tariffs, imposts and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Taxing Authority, including, without limitation, taxes or other charges on or with respect to income, built-in gains, excessive net passive income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation or net worth, taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value-added or gains taxes, license, registration and documentation fees, and customs' duties, tariffs and similar charges; (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, combined, consolidated or unitary group for any taxable period; and (iii) any liability for the payment of amounts of the type described in clause (i) or clause (ii) as a result of being a transferee of, or a successor in interest to, any Person or as a result of an express or implied obligation to indemnify any Person.

"*Tax Return*" means any return, statement, report or form (including any estimated tax reports and returns, withholding tax reports and returns and information reports and returns) required to be filed with respect to any Tax.

"*Taxing Authority*" means any Governmental Entity or taxing authority responsible for the assessment, collection or administration of any Tax.

"*Unaudited Financial Statements*" has the meaning ascribed to it in Section 3.06.

(b) Construction. Unless the context of this Agreement otherwise clearly requires: (i) words of any gender include each other gender and the neuter; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms

10

"*hereof*," "*herein*," "*hereby*," "*hereto*" and derivative or similar words refer to this entire Agreement as a whole and not to any particular Article, Section or other subdivision; (iv) the terms "*Article*" or "*Section*" or other subdivision refer to the specified Article, Section or other subdivision of the body of this Agreement; (v) the words "*include*," "*includes*" and "*including*" shall be deemed to be followed by the phrase "without limitation" except when preceded by a negative predicate; and (vi) when a reference is made in this Agreement to a Schedule or Exhibit, such reference shall be to a Schedule or Exhibit to this Agreement unless otherwise indicated. All accounting terms used herein are expressly defined herein shall have the meanings given to them under GAAP. The term "*party*" or "*parties*" (but not the term "*third party*") when used herein refers to Purchaser, on the one hand, and the Sellers and the Company, on the other hand. When used herein, the phrase "*to the knowledge of*" any Person, "*to the best knowledge of*" any Person, "*known to*" any Person or any similar phrase, means, in the case of Purchaser, the actual knowledge of Christine Jacobs, Bruce Smith, and Frank Tarallo, in the case of the Company, the actual knowledge of Eddings, David Catlin, David Ozinga, Lauren Hart and Angela Walters, in the case of each Seller, the actual knowledge of such Seller, and in each case, the knowledge that such Person or Persons would have obtained of the matter represented after reasonable due and diligent inquiry of those employees and agents of such Person whom such Person reasonably believes would have actual knowledge of the matters represented. In this Agreement, any reference to a party conducting its business or other affairs or taking any action in the "*ordinary course of business*" and "*ordinary course of business consistent with past practice*" refers to the business and practice of the specified business as heretofore conducted to the extent: (a) such action is consistent with such party's past practices and is taken in the ordinary course of such party's normal day-to-day operations; and (b) such action is not required to be authorized by such party's shareholders or members, as applicable, such party's board of directors or managers, as applicable, or any committee thereof and does not require any other separate or special authorization of any nature from a third party.

## ARTICLE II

## SALE AND TRANSFER OF SHARES; CLOSING

Section 2.01   Purchase and Sale of Company Shares and Company Stock Derivatives.   On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser hereby purchases, acquires and accepts from Sellers, and Sellers hereby sell, assign, convey and deliver to Purchaser, all of their respective right, title and interest in and to the Company Shares and Company Stock Derivatives, free and clear of any Encumbrances.

Section 2.02   Executed Stock Powers.   At the Closing, and simultaneously with the execution and delivery of this Agreement, each Seller shall deliver executed stock powers, in a form reasonably satisfactory to Purchaser, together with those original certificates that immediately prior to the Closing represented the Company Shares held by such Seller, or a duly executed affidavit of lost certificate and indemnity for any certificate for Company Shares which has been lost, stolen, seized or destroyed (the "*Certificates*"), to Purchaser. Also at the Closing, and simultaneously with the execution and delivery of this Agreement, all Company Stock Derivatives shall cease to be outstanding, shall be cancelled, retired and shall cease to exist, and each holder of Company Stock Derivatives shall cease to have any rights with respect to such

11

Company Stock Derivatives, except the right to receive the consideration described in Section 2.04 (iii).

Section 2.03   Purchase Price.  The aggregate purchase price for the Company Shares and Company Stock Derivatives is Thirty Four Million Dollars ($34,000,000) (the "*Purchase Price*").  The Purchase Price is payable in cash and Gross Shares at the Closing in the manner provided in Section 2.04.

Section 2.04   Payment of Purchase Price.  The Purchase Price which is payable at Closing shall be paid as follows:

(i)     that amount, if any, of the Purchase Price necessary to be paid to the applicable lenders and other creditors of the Company or Sellers to release and satisfy in full any Indebtedness and Encumbrances with respect to the Company, or otherwise obtain clear title to the Company's Assets and Properties, shall be paid to such lenders and other creditors in accordance with the payoff letters or other documentation provided by such creditors;

(ii)    Purchaser shall deliver to the Escrow Agent (a) those certain certificates, registered in the name of each Seller who is receiving ten percent (10%) of his allocable portion of the Purchase Price in Purchaser Common Stock, representing the Gross Shares and (b) cash in the amount of Two Hundred Fourteen Thousand Four Hundred Forty Two and 79/100 Dollars ($214,442.79), representing the sum of those Sellers' ten percent (10%) of their allocable portion of the Purchase Price who are receiving their said allocable portion of the Purchase Price solely in cash, for a total deposit valued at Three Million Four Hundred Thousand Dollars ($3,400,000) (the "*Escrow Amount*"), in accordance with Article VII and the escrow greement entered into on the Closing Date among Purchaser, Sellers' Representative and the Escrow Agent in substantially the form of Exhibit A hereto (the "*Escrow Agreement*").  Each Seller's respective interest in the Escrow Amount is set forth opposite each Seller's name on Schedule 1;

(iii)   each Seller's portion of the Purchase Price allocable to the Company Stock Derivatives held by such Seller shall be paid to such Seller in shares of Purchaser Common Stock, cash or a combination thereof, in the manner and amount set forth opposite each Seller's name on Schedule 1 hereto, such amount being determined in the case of any derivative or option to purchase Company Shares by subtracting the aggregate applicable exercise price from the portion of the Purchase Price allocable to the number of Company Shares subject to the option, and in the case of current or former employees, the amount shown of Schedule 1 shall be reduced by any required tax withholding; and

(iv)    each Seller's allocable portion of the balance of the Purchase Price shall be paid to such Seller in cash.

The cash portion of the Purchase Price payable to each Seller shall be transmitted by wire transfer or other immediately available funds to a bank or other account designated by such Seller in the amount set forth opposite each Seller's name on Schedule 1.

12

Section 2.05   Closing.  The closing of the purchase and sale of the Company Shares and Company Stock Derivatives shall take place effective as of 5:00 pm Eastern Daylight Savings Time on the date of this Agreement (the "Closing Date") or such other date as the parties hereto agree (the "Closing").  The Closing shall take place at the Dallas office of Powell Goldstein LLP, JP Morgan Chase Tower, Suite 3200, 2200 Ross Avenue, Dallas, TX 75201.

Section 2.06   Closing Deliverables.  Sellers and the Company shall deliver to Purchaser and Purchaser shall deliver to Sellers and the Company fully executed originals of the opinions, certificates, contracts, documents and instruments required by Article VI.

Section 2.07   Exemption from Registration.  The Gross Shares to be issued in connection with the transactions contemplated by this Agreement will be issued in a transaction exempt from registration under the Securities Act by reason of Section 4(2) thereof and/or Regulation D and may not be re-offered or resold other than in conformity with the registration requirements of the Securities Act and such other Laws as may be applicable thereto or pursuant to an exemption therefrom.  The certificates representing the Gross Shares shall be legended to the effect described above and shall include such additional legends as necessary to comply with applicable U.S. federal and state securities Laws and other applicable restrictions.

Section 2.08   Stock Registration Rights.  The Purchaser shall on or before the first anniversary of the date of this Agreement, file with the SEC a Registration Statement on Form S-3 covering the resale of all of the Gross Shares issued on the Closing Date (the "Registrable Securities").  To evidence the Purchaser's obligations under this Section 2.08, the Purchaser shall execute and deliver to the Sellers a Registration Rights Agreement substantially in the form of Exhibit B hereto (the "Registration Rights Agreement").

Section 2.09   Further Assurances; Post-Closing Cooperation.  At any time or from time to time after the Closing, at Purchaser's request and sole cost and without further consideration, Sellers shall execute and deliver to Purchaser such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Purchaser may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Purchaser, and to confirm Purchaser's title to, the Company Shares and Company Stock Derivatives, and, to the full extent permitted by Law, to put Purchaser in actual possession and operating control of the Company and to assist Purchaser in exercising all rights with respect thereto.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF EACH SELLER AND THE COMPANY

As inducements to Purchaser to enter into this Agreement and to consummate the transactions contemplated herein, each Seller (with respect to himself, herself or itself only, and with respect only to the representations and warranties contained in Sections 3.02, 3.03, 3.04, 3.05(c), 3.20(c), 3.23, 3.29 and 3.33), and the Company represent and warrant to Purchaser that, subject to the exceptions specifically disclosed in writing in a schedule delivered to Purchaser prior to (or contemporaneously with) the signing of this Agreement ("Disclosure Schedule"), the

13

statements set forth in this Article III are true and correct. The Disclosure Schedule shall be arranged in sections and subsections corresponding to the numbered sections and lettered subsections of this Agreement, and all exceptions shall reference a specific representation set forth in this Article III and shall apply only to such numbered section and lettered subsection unless expressly cross-referenced in another numbered section and lettered subsection.

Section 3.01    Organization, Standing and Power.

(a)    The Company is a corporation duly organized, validly existing and in good standing under the Laws of the state of its incorporation. Except as set forth in Section 3.01 of the Disclosure Schedule, the Company has the corporate power and authority to own, use, license, lease and operate its Business and to carry on its Business as it is now being conducted and as currently proposed to be conducted and is duly qualified, licensed or admitted to do business and is in good standing in each jurisdiction in which the ownership, use, licensing, leasing or operation of its Business, or the conduct or nature of its Business, makes such qualification, licensing or admission necessary.

(b)    The Company does not own any wholly or partially-owned Subsidiaries.

Section 3.02    Authority.

Sellers and the Company have the requisite capacity to enter into, execute and deliver this Agreement and the Ancillary Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Ancillary Agreements to which the Sellers, the Company or any of their Affiliates are each a party, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate, shareholder and other action on the part of the Sellers and the Company. This Agreement has been, and the Ancillary Agreements to which the Sellers and the Company are a party will be, duly executed and delivered by such parties. This Agreement constitutes, and the Ancillary Agreements to which the Sellers and the Company are a party, when executed and delivered as contemplated by this Agreement, will constitute, assuming due authorization, execution and delivery by each of the other parties hereto and thereto, legal, valid and binding obligations of such parties, enforceable against such parties in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy and insolvency laws, the rights of creditors generally, and general principles of equity.

Section 3.03    No Conflicts. The execution and delivery by the Sellers and the Company of this Agreement and the Ancillary Agreements to which they are parties do not, and the consummation by the Sellers and the Company of the transactions contemplated hereby and thereby do not and will not:

(a)    conflict with, or result in any violation or breach of, or default under (with or without notice or lapse of time, or both) or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under (i) any provision of the Articles of Incorporation, Bylaws or other charter or organizational documents of the Company, as presently in effect, or (ii) any of the Real Property Leases, Business Contracts, Personal

14

Property Leases, or Business Licenses, or any other material mortgage, indenture, lease, Contract, or other instrument, permit, concession, franchise, or license applicable to the Company, its Business or any of the Assets and Properties applicable to it;

(b)     conflict with or result in a violation or breach of, or default under, any Law or Order applicable to the Company, its Business or any of the Assets and Properties of the Company that has had, or would reasonably be expected to have, a Material Adverse Effect on the Business or any Assets and Properties of the Company;

(c)     except as listed in <u>Section 3.27 of the Disclosure Schedule</u>, (i) conflict with or result in a violation or breach of, (ii) constitute a default (or an event that, with or without notice or lapse of time or both, would constitute a default) under, (iii) require the Sellers or the Company to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of, (iv) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, (v) result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments or performance under, or (vi) result in the loss of any material benefit under any of the terms, conditions or provisions of, any Business Contract, Business License, Real Property Lease or Personal Property Lease to which the Company is a party; or

(d)     result in the creation or imposition of (or the obligation to create or impose) any Encumbrance upon the Business or any of the Assets and Properties of the Company.

Section 3.04   <u>No Consents</u>. No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to the Sellers, the Company, its Business or any of the Assets and Properties applicable to the Company in connection with the execution and delivery of this Agreement or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby, except for (i) such consents, authorizations, filings, approvals and registrations which would not prevent or alter or delay any of the transactions contemplated by this Agreement or any of the Ancillary Agreements, (ii) such consents, approvals, orders, authorizations, registrations, declarations and filings as may be required under applicable state or federal securities Laws; and (iii) as set forth on <u>Section 3.04 of the Disclosure Schedule</u>, such consents, approvals, orders, authorizations, registrations, declarations and filings as may be required under applicable Food and Drug Administration,  Drug Enforcement Administration, Medicare/Medicaid, CE Mark, ISO Certification, Patent and Trademark Office and Environmental Law authorities.

15

Section 3.05  Title to Assets and Properties, Company Shares and Company Stock Derivatives; Absence of Encumbrances.

(a)    The Company has good and valid title to all of the Assets and Properties of the Company (excluding any assets that are subject to a lease) free and clear of any Encumbrances except for Permitted Encumbrances. The Assets and Properties of the Company are not subject to any preemptive right, right of first refusal or other right or restriction, are in good operating condition and repair, reasonable wear and tear excepted, are suitable and adequate for use in the ordinary course of business, and conform in all material respects to all applicable Laws. Except for the Assets and Properties currently owned or leased by the Company, there are no other Assets or Properties that are required or will be required by the Company after the Closing in order to conduct the Business consistent in all material respects with the manner in which the Company conducts its Business on and as of the date of this Agreement.

(b)    Except as set forth in Section 3.05 of the Disclosure Schedule, all of the Real Property Leases and Personal Property Leases are valid, binding and enforceable on the Company in accordance with their terms, and, to the knowledge of the Company, are enforceable against the other party or parties thereto in accordance with their terms. The Company is not in default under any such lease applicable to it and there has not occurred any event that, either alone or with the giving of notice or lapse of time or both, would constitute a default by the Company under such lease. To the knowledge the Company, there is no current default by any other party to any such lease and no event has occurred that, either alone or with the giving of notice or lapse of time or both, would constitute a default by such party under any such lease.

(c)    Each Seller has good and marketable title to his or her Company Shares or Company Stock Derivatives, free and clear of all Encumbrances (other than restrictions on transfer under applicable state and federal securities Laws). To the extent that any Seller's Company Shares or Company Stock Derivatives constitute community property with such Seller's spouse, such spouse has the requisite capacity to execute the spousal consent form incorporated in the signature pages to this Agreement, and such spouse's execution of such spousal consent form shall be a legal, valid and binding obligation of such spouse.

Section 3.06  Financial Statements and Schedules. As set forth in Section 3.06 of the Disclosure Schedule, the Company has delivered to Purchaser the Company's audited balance sheet and income statements as of and for the twelve (12) month period ended December 31, 2005, respectively (the "Audited Financial Statements"), as well as the Company's unaudited balance sheet and income statement as of and for the six (6) months ended June 30, 2006, respectively ( the "*Unaudited Financial Statements*"). The Audited Financial Statements and Unaudited Financial Statements delivered to Purchaser with respect to the Company are correct and complete in all material respects and were prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated and with each other. The Audited Financial Statements and Unaudited Financial Statements present fairly and accurately the financial position and operating results of the Company for the periods indicated therein, subject to normal year-end audit adjustments, which adjustments are of a normal and recurring nature and are not material in amount. The Company maintains and, through the Closing Date, will continue to

16

maintain a system of internal accounting controls that is reasonably and in good faith believed by the Company to be adequate for their intended purpose.

Section 3.07  Ordinary Course.  Since December 31, 2005, the Company has conducted its Business in the ordinary course consistent with past practice and there has not occurred any change, event or condition (whether or not covered by insurance) that has had, or would reasonably be expected to have, a Material Adverse Effect on the Company or its Business.  In addition, without limiting the generality of the foregoing, since December 31, 2005:

(a)     The Company has not entered into any strategic alliance, joint development or joint marketing Contract relating to or involving the Business;

(b)     Except as set forth in Section 3.07 of the Disclosure Schedule, there has not been any amendment or other modification (or agreement to do so) or violation of the terms of, any of the Business Contracts, Business Licenses or Personal Property Leases;

(c)     Except as set forth in Section 3.07 of the Disclosure Schedule, the Company has not entered into any transaction with any Seller, officer, director, partner, member or Employee engaged in the conduct of the Business;

(d)     The Company has not entered into any Contract pursuant to which any other Person is granted manufacturing, marketing, distribution, licensing or similar rights of any type or scope with respect to any product of the Business;

(e)     The Sellers and the Company have not authorized, declared or paid any distributions or dividends to any Person;

(f)     Except as set forth in Section 3.07 of the Disclosure Schedule, no Action or Proceeding has been commenced or, to the knowledge of the Company, threatened by or against the Company relating to the Business or any of the Assets and Properties of the Company, and the Company has not received any request for indemnification with respect to any product of the Company or any Company Intellectual Property;

(g)     There has not been any transfer, waiver or release (by way of a License, assignment or otherwise) to or Encumbrance by any Person of rights to any Company Intellectual Property;

(h)     The Company has not made or agreed to make any waiver of rights to, or license, lease or other disposition of, any of the Assets and Properties of the Company;

(i)     Except as reflected in either the Audited Financial Statements or the Unaudited Financial Statements, the Company has not made or agreed or determined to make any write-off, write-down or revaluation of any of the Assets and Properties of the Company or any change in any reserves or Liabilities associated therewith;

(j)     The Company has not granted any severance or termination pay, and has not paid or agreed or made any commitment to pay any discretionary or stay bonus, to any Employee or independent contractor of or consultant to the Company;

17

(k)    Except as set forth in Section 3.07 of the Disclosure Schedule, the Company has not made, granted or approved any (A) grant of options, restricted stock or phantom stock or any change in the vesting schedule applicable thereto, or (B) increase in salary, rate of commissions, rate of consulting fees, rate or amount of distribution to equity holders or other compensation of any current Employee, independent contractor or consultant engaged in the conduct of the Business, and the Company has not paid or approved the payment of any other consideration of any nature whatsoever (other than salary, commissions or consulting fees and customary benefits paid to any current or former Employee or independent contractor of or consultant to the Business) to any current or former Employee or independent contractor of or consultant to the Business;

(l)    The Company has not made or changed any election in respect of any Tax, adopted or changed any accounting method in respect of any Tax, entered into any Tax allocation agreement, Tax sharing agreement, Tax indemnity agreement or closing agreement, settlement or compromise of any claim or assessment in respect of any Tax, or consented to any extension or waiver of the limitation period applicable to any claim or assessment in respect of any Tax;

(m)    Except as reflected in either the Audited Financial Statements or the Unaudited Financial Statements, the Company has not made any change in accounting policies, principles, methods, practices or procedures (including for bad debts, contingent liabilities or otherwise, respecting capitalization or expense of research and development expenditures, depreciation or amortization rates or timing of recognition of revenue and expense) used in connection with the Business;

(n)    To the knowledge of the Company, the Company has observed all Laws and Orders applicable to the Business;

(o)    The Company has taken all action required to procure, maintain, renew, extend or enforce the Company Intellectual Property used or held for use in the Business, including submission of required documents or fees during the prosecution of patent, trademark, copyright or other applications for the Company Intellectual Property rights;

(p)    There has been no physical damage, destruction or other loss (whether or not covered by insurance) that has had, or would reasonably be expected to have, a Material Adverse Effect on the Business or any Assets and Properties of the Company;

(q)    No default by the Company under or violation by the Company of any Contract of the Company has occurred, and to the knowledge of the Company, no event has occurred which, with notice or lapse of time or both, would constitute such a default or violation; and

(r)    The Company is not obligated to any Person to maintain, modify, improve or upgrade the Business or any of the Assets and Properties of the Company.

Section 3.08    Absence of Undisclosed Liabilities. The Company has no liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) except for liabilities or obligations reflected or reserved

18

against in the Unaudited Financial Statements and current liabilities incurred in the ordinary course of business since the respective dates thereof.

Section 3.09    Litigation; Regulatory Compliance.

(a)    Except as set forth in Section 3.09(a) of the Disclosure Schedule, there is no private or governmental Action or Proceeding pending, or, to the knowledge of the Company, threatened by or against the Company relating to the Assets and Properties of the Company or the operation of the Business, and no judgment, decree or Order applicable to the Company or any of the Assets and Properties of the Company, that could reasonably be expected to prevent, enjoin, alter or delay any of the transactions contemplated by this Agreement or the Ancillary Agreements or to have a Material Adverse Effect on the Business.

(b)    Except as set forth in Section 3.09(b) of the Disclosure Schedule, the Company does not currently, nor has it ever in the past, participated in any Payment Programs.

(c)    Neither the Company, nor any director or officer, nor to the knowledge of the Company, any Employee or agent thereof, with respect to actions taken on behalf of the Company, (A) has been assessed a civil money penalty under Section 1128A of the Social Security Act or any regulations promulgated thereunder, (B) has been excluded from participation in any federal health care program or state health care program (as such terms are defined by the Social Security Act), (C) has been convicted of any criminal offense relating to the delivery of any item or service under a federal health care program relating to the unlawful manufacture, distribution, dispensing or administration of medical supplies, products or devices, or (D) has been a party to or subject to any Action or Proceeding concerning any of the matters described above in clauses (A) through (C).

(d)    The Company (A) is in compliance in all material respects with all Laws relating to the operation of the Business, (B) is in compliance in all material respects with all Laws relating to the manufacturing, labeling, packaging, relabeling, repackaging, distribution, marketing, advertising, use/distribution, or sale of medical supplies, products and devices, and (C) is not subject to any sanction, Order or other adverse action by any Governmental Entity for the matters described above in clauses (A) and (B). This includes the laws, rules and regulations implemented, enforced or promulgated by the Food and Drug Administration, the Federal Trade Commission, the Centers for Medicare and Medicaid Services, the Office of Inspector General, OSHA or comparable laws, rules and regulations implemented, enforced or promulgated by any Governmental Entity where the Company's medical supplies, products and devices are manufactured, labeled, packaged, relabeled, repackaged, distributed, marketed, advertised, used, distributed or sold. The Company has responded to and implemented all corrective measures in connection with any investigations conducted by the Food and Drug Administration. The Company is not and has not been in violation of any outstanding Order that has had, or would reasonably be expected to have, a Material Adverse Effect on the Company or its Business. Except in the ordinary course of the Business, consistent with past practice, the Company is not required to make, and has no reasonable expectation that it will be required to make, any expenditures to achieve or maintain compliance with any Law.

(e)    There is no third-party litigation related to the Company or its Business where the Company or, to the knowledge of the Company, an Employee of the Company, has ·een served a subpoena to testify.

Section 3.10    Product Liability Claims.  Except as described in Section 3.10 of the Disclosure Schedule, there:  (a) have been no product or service warranty claims made by customers of the Company which were not reimbursed or assumed by the Company's suppliers; (b) have been no product recalls by the Company, and to the knowledge of the Company, there is no reasonable basis for any product recalls; and (c) are no product and/or service warranties outstanding or currently being offered by the Company to its customers (other than those of third parties for which the Company has no obligation or responsibility).  Furthermore, the Company and any of its predecessors in interest have not been subject to any product liability claim relating to any of the products of the Company or operation of the Business and, to the knowledge of the Company, no such claim is threatened and no circumstance or condition exists that would reasonably be expected to give rise to such a claim.

Section 3.11    Restrictions on Business Activities.  There is no agreement, judgment, injunction, Order or decree binding upon the Company which has, or would reasonably be expected to have, the effect of prohibiting or impairing any current business practice of the Company or the conduct of the Business as currently conducted by the Company.

Section 3.12    Governmental Authorization.  The Company has obtained each Governmental Entity consent, license, permit, grant, and other authorization (i) pursuant to which the Company currently operates, manufacturers, labels, packages, relabels, repackages, distributes, markets, advertises, or distributes medical supplies and products or holds any interest n any of the Assets and Properties of the Company or (ii) that is required for the operation of the Business or the holding of any such interest ((i) and (ii) herein collectively called the "*Company Authorizations*"), and all of the Company Authorizations are in full force and effect, except where the failure to obtain or have any of the Company Authorizations would not reasonably be expected to have a Material Adverse Effect on the Business.  Section 3.12 of the Disclosure Schedule sets forth all Company Authorizations currently in force and, except as set forth in Section 3.12 of the Disclosure Schedule, no consent or approval of any Governmental Entity or other third party is necessary in order to consummate the transactions contemplated hereby.

Section 3.13    Intellectual Property.

(a)    The Company owns all rights, title and interest in and to, or is licensed or otherwise possesses a valid and enforceable right to use, all the Company Intellectual Property. No Action or Proceeding or claim to the contrary or any challenge by any other Person to the rights, title or interests of the Company with respect to the foregoing is pending or, to the knowledge of the Company, threatened.  The Company has not entered into any exclusive agreements related to the Company Intellectual Property.

(b)    The Company owns all rights, title and interest in and to all of the Company's Intellectual Property, free and clear of any Encumbrances.

20

(c)    Except as set forth in <u>Section 3.13(c) of the Disclosure Schedule</u>, the Company Intellectual Property constitutes all the Intellectual Property used or useful in, or necessary for, the conduct of the Business as it was conducted in the twelve (12) months preceding the date hereof, as a going concern, and as it currently is conducted, including the design, development, distribution, marketing, manufacture, use, import, license, obtaining regulatory approval for, and sale of the products, technology and services of the Company (including products, technology, methods or services of the Company currently under development).

(d)    No Action or Proceeding or claim relating to the Company Intellectual Property, including (without limitation) any interference, reissue, reexamination, protest, or opposition proceeding before an administrative agency or office, is pending or, to the knowledge of the Company, threatened against the Company or any of its officers, directors, customers, licensees, licensors or Affiliates.

(e)    Except as set forth in <u>Section 3.13(e) of the Disclosure Schedule</u>, to the knowledge of the Company, none of the Company's Intellectual Property infringes or has been alleged to infringe any Intellectual Property, proprietary or contractual right of any other Person or has been challenged or threatened in any way.

(f)    Each material license agreement relating to the Business is in effect, and the Company has not taken or failed to take any action and, to the knowledge of the Company, no other event has occurred that could subject any such license agreement to termination or otherwise cause any such license agreement not to be in effect in the foreseeable future.    The Company has the right to use the Intellectual Property not owned by it without payment or obligation to a third party, in perpetuity, and, in those instances where a payment is required, the Company has paid all royalties due and performed all obligations under all such license agreements.  The Company is not presently in default and has received no notice of default under any such license agreement.

(g)    Except as set forth in <u>Section 3.13(g) of the Disclosure Schedule</u>, the Company has received no request for indemnification or contribution, or to defend or hold harmless, from any third party in respect of any claim that relates to the Business.

(h)    <u>Section 3.13(h) of the Disclosure Schedule</u> lists (i) all patents and patent applications and all registered and unregistered trademarks, trade names and service marks, registered copyrights, registered domain names, and registered mask works, contained in the Company Intellectual Property, the jurisdictions in which each such Company Intellectual Property right has been issued or registered or in which any application for such issuance and registration has been filed, and the nature and extent of the ownership interest or other right held in each such Company Intellectual Property right; (ii) all licenses, sublicenses and other agreements as to which the Company is a party and pursuant to which any Person is authorized to use any Company Intellectual Property; (iii) all licenses, sublicenses and other agreements with respect to Intellectual Property of a third party which are incorporated in, are, or form a part of any product of the Business; (iv) a description of all Assets and Properties that the Company considers trade secrets; (v) Intellectual Property not covered by any of the foregoing; and (vi) the unpatented ideas, improvements and trade secrets of the Company.  Each such item of Company

21

Intellectual Property listed (or required to be listed) in Section 3.13(h) of the Disclosure Schedule is owned exclusively by the Company (excluding Intellectual Property licensed to the ompany under any License) and is free and clear of any Encumbrances. The Company (i) owns exclusively all trademarks, service marks, trade dress and trade names constituting Company Intellectual Property, and (ii) owns exclusively, and has good title to, each copyrightable work that is a product of the Company and each other work of authorship related to the Business.

(i)     Except as set forth in Section 3.13(i) of the Disclosure Schedule, to the knowledge of the Company, there is no unauthorized use, disclosure, infringement or misappropriation of any Company Intellectual Property, or any third-party Intellectual Property, by the Company or any third party, including (without limitation) any Employee or former Employee, consultant, or contractor of the Company. The Company has not entered into any agreement to defend, indemnify or hold harmless any other Person against any charge or claim of infringement or misappropriation of any Company Intellectual Property or third party Intellectual Property.

(j)     All patents, registered trademarks, service marks, copyrights, URLs and domain names owned by the Company are valid and subsisting, and all necessary registration, maintenance, renewal fees, annuity fees and taxes in connection with such Company's Intellectual Property have been paid. All necessary documents, affidavits and certificates in connection with such Company Intellectual Property have been filed with all relevant patent, copyright, trademark or other authorities in all applicable jurisdictions, for the purpose of maintaining such Company Intellectual Property. The Company (i) has not received notice that the Company has been named as a party in any opposition or in any Action or Proceeding which involves a claim of infringement of any Company Intellectual Property, or violation of any trade secret or other proprietary right, of any third party; (ii) has no knowledge that the manufacturing, marketing, licensing, sale or offer of licensing or sale of products of the Company infringes or misappropriates any patent, trademark, service mark, copyright, trade secret, mask work or other proprietary right of any third party; and (iii) has not brought any Action or Proceeding for infringement of any of the Company Intellectual Property or breach of any license or agreement involving any of the Company Intellectual Property against any third party.

(k)     To the knowledge of the Company, the Company has not and does not, in connection with the operation of the Business (i) own any product, technology, service or publication, (ii) publish or distribute any material or (iii) engage in any conduct or speech (oral or written) that would constitute a defamatory or libelous statement or material that is false advertising or otherwise violate in any material respect any Law.

(l)     The Company has secured valid and enforceable written agreements with all consultants, independent contractors, Employees, joint inventors, joint authors and other Persons who developed, created, or contributed to the development or creation of Company Intellectual Property and has either (i) obtained ownership of, and is the exclusive owner of, all such Company Intellectual Property by operation of Law or by valid assignment or (ii) obtained a valid and enforceable license under or to such Company Intellectual Property that the Company does not already own by operation of Law.

(m)    The Company has taken all commercially reasonable steps to protect and preserve the confidentiality and trade secret status of all information used in the Business which derives any value from being not generally known or readily ascertainable by others through legitimate means and is not otherwise protected by issued patents, trademarks or copyrights of the Company ("*Confidential Information*"), and have not permitted the Company's rights in such Confidential Information to lapse or enter the public domain.    To the knowledge of the Company, the Company has secured valid and enforceable written assignments from all consultants, Employees and other contributors who contributed to the creation or development of Confidential Information. All use, disclosure or appropriation by a third party of Confidential Information owned by the Company or, to the Company's knowledge, has been pursuant to the terms of a written agreement between the Company and such third party protecting the confidentiality of and limiting the use of Confidential Information. All use, disclosure or appropriation by the Company of confidential and proprietary information known by the Company to be owned by third parties has been pursuant to the terms of a written agreement permitting such use, disclosure or appropriation between the Company, as the case may be, and the owner of such confidential and proprietary information, or is otherwise lawful. There are no actions that must be taken by the Company within one hundred and eighty (180) days following the date of this Agreement that, if not taken, would result in the loss of any Company Intellectual Property, including the payment of any registration, maintenance or renewal fees, annuity fees and Taxes or the filing of any responses, documents, applications, affidavits or certificates for the purposes of obtaining, maintaining, perfecting or preserving or renewing any such Company Intellectual Property.    In each case in which the Company has acquired from any Person ownership of any Company Intellectual Property, the Company has obtained a valid and enforceable assignment sufficient to transfer all right, title and interest in, to and under such Company Intellectual Property (including the right to seek past and future damages with respect to such Company Intellectual Property) to the Company and, to the extent provided for by and reasonably required to protect the Company's ownership rights in and to such Company Intellectual Property in accordance with applicable Laws, the Company has recorded each such assignment of Company Intellectual Property with the relevant Governmental Entity, including the U.S. Patent and Trademark Office, the U.S. Copyright Office, or comparable authorities in any relevant foreign jurisdiction, as the case may be.

(n)    Neither the execution and delivery of this Agreement and the Ancillary Agreements nor the consummation of the transactions contemplated hereby and thereby will result in the Company granting any rights or licenses with respect to the Company Intellectual Property to any Person.

(o)    The Company has not, waived or released any rights, either actively or otherwise, that have had, or would reasonably be expected to have, a Material Adverse Effect relating to the Company Intellectual Property.

(p)    The Company has not sent notices to third parties of potential infringement of the Company Intellectual Property.

(q)    All patents and patent applications relating to products of the Company have properly identified all inventors, inventorship being determined according to conventional law regarding inventorship qualifications.

23

(r)    The Company has reviewed all issued patents and pending applications with its patent counsel and all inventors on such patents and pending applications are properly named, and any individuals who should not have been named have been removed by filing appropriate petitions with the U.S. Patent and Trademark Office.

Section 3.14    Environmental Matters.  Except as disclosed in Section 3.14 of the Disclosure Schedule:

(a)    Neither the Company nor, to the knowledge of the Company, any Person: (i) has used, generated, stored, treated, disposed, handled or placed any Hazardous Material on, in, at, under, around or affecting any property currently or formerly owned, operated, occupied or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases), except in compliance with all Environmental Laws; (ii) has transported or arranged for the transportation of any Hazardous Material currently or formerly on, in, at, under, around or affecting any property currently or formerly owned, operated, occupied, or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases) to any location which to the knowledge of the Company is or may become the subject of any action, suit or proceeding relating to Hazardous Material or any Environmental Law; or (iii) has disposed of, transported, sold, distributed, or manufactured any product, substance or material of the Company which is or contains any Hazardous Material, except in compliance with all Environmental Laws;

(b)    There has been no Release or threatened Release of Hazardous Material by the Company on, in, at, under, around or affecting any property currently or formerly owned, operated, occupied or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases), or, to the knowledge of the Company on adjacent parcels of real estate;

(c)    There are no actual, or to the knowledge of the Company, potential conditions or circumstances, including, without limitation, actual or potential conditions or circumstances relating to Hazardous Material or Environmental Laws, on, in, at, under, around or affecting any property currently or formerly owned, operated, occupied or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases), which pose an unreasonable risk or threat to the environment, the health or safety of persons, or the market value of such properties;

(d)    To the knowledge of the Company, there are:  (i) no underground storage tanks, whether in use, active, closed or abandoned, that are on, in, at, under, around or affecting any property currently or formerly owned, operated, occupied or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases), and the Company has provided a detailed description of all above ground or underground storage tanks removed by or on behalf of the Company, in Section 3.14 of the Disclosure Schedule; and (ii) no Hazardous Materials which are present on, in, at, under, around or affecting any property currently or formerly owned, operated, occupied or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases) except those Hazardous Materials held in compliance with all applicable Environmental Laws and the

24

presence of which would not trigger any reporting, clean-up or remedial obligation pursuant to any Environmental Laws;

(e) The Company and all properties currently or formerly owned, operated, occupied or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases) are and have been in compliance with all Environmental Laws, except where the failure to be in such compliance has not had and would not reasonably be expected to have a Material Adverse Effect;

(f) The Company currently holds any and all environmental approvals, permits, licenses, clearances and consents necessary for the conduct of the Business as such activities and business are currently being conducted;

(g) There are no Environmental Claims pending against the Company or, to the knowledge of the Company and the Sellers, threatened or potentially threatened against the Company, by any Person (including, without limitation, any Governmental Entity), relating to: (i) the Business, (ii) any of the Assets and Properties of the Company, (iii) any property currently or formerly owned, operated, occupied or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases), or (iv) any current or former product of the Company that has been manufactured, sold, distributed, transported or disposed of. The Sellers have no knowledge of any fact or circumstance which is reasonably likely to involve the Company in any Environmental Claims or to impose upon the Company any Liability arising from or related to any Environmental Law;

(h) To the knowledge of the Company and the Sellers, there are no Encumbrances threatened or attached to any real estate property constituting Assets and Properties of the Company, which arise under or pursuant to any applicable Environmental Law, and no action of any Governmental Entity has been taken or, to the knowledge of the Company and the Sellers, is threatened, which could subject any such real estate property to such Encumbrances;

(i) The Company and the Sellers have not entered into any agreement to provide indemnification to any Person in a manner relating to Hazardous Material or any Environmental Laws, except for indemnity agreements in favor of lenders or ground lessors entered into in connection with any loan or credit agreements or ground leases, for property currently or formerly owned, operated, occupied or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases);

(j) The Company and the Sellers have provided to Purchaser prior to the execution of this Agreement, true and complete copies and results of any reports, studies, analyses, tests, investigation, monitoring or similar documentation within the knowledge, possession or control of the Sellers and the Company, which pertain to the presence or potential presence of Hazardous Materials on, in, at, under, around or affecting any property currently or formerly owned, operated, occupied or leased by the Company (including, without limitation, property owned or leased pursuant to the Real Property Leases); and