(k)    The Company is not subject to any material capital expenditures or material obligations (contractual or otherwise) arising under or relating to Environmental Laws.

Section 3.15    Taxes.

(a)    Except as set forth on Section 3.15(a) of the Disclosure Schedule, the Company has properly completed and timely filed all Tax Returns required to be filed by it and has paid all Taxes with respect to the Assets and Properties and the Business which are due through the date of this Agreement and will properly complete and timely file all Tax Returns and pay all Taxes with respect to the Assets and Properties and the Business for periods through the Closing Date. Except for Permitted Encumbrances, there is and at Closing there will be (i) no claim for any Tax that is an Encumbrance against any of the Assets and Properties of the Company or that is being asserted against the Company with respect to any of the Assets and Properties or the Business, (ii) no audit of any Tax Return relating to the Company or any of the Assets and Properties or the Business being conducted by any Taxing Authority, and (iii) no extension of any statute of limitations on the assessment of any Tax with respect to the Company or any of the Assets and Properties or the Business.

(b)    Except as disclosed in Section 3.15(b) of the Disclosure Schedule, the Company has withheld all amounts required to be withheld by Law from payment made to any Person, whether that Person is regarded as an employee, independent contractor, or otherwise, in the conduct of the Business. The Company has timely paid to the appropriate Taxing Authority all amounts so withheld or otherwise due in connection with all such payments, and has timely filed all requisite returns with the Taxing Authorities with respect to such Taxes. The Company is not a party to any Tax proceeding with respect to the withholding of Taxes from any payments made in the conduct of the Business. To the knowledge of the Company, no investigation is being conducted against the Company by any Taxing Authority with respect to any of the above withholding, payment, filing or any other obligations in connection with the above.

Section 3.16    Employee Benefit Plans.

(a)    Section 3.19(d) of the Disclosure Schedule lists all Employees employed by the Company on the date hereof and, with respect to each such listed Employee, his/her position, salary, incentive compensation, and all major employment benefits estimated to be paid for the 2006 calendar year. No salary, incentive compensation, pension or other major employment benefits have been granted to any such Persons on terms and conditions which are more favorable than those indicated in Section 3.19(d) of the Disclosure Schedule.

(b)    Except for compensation paid by the Company to Eddings, each payment made or authorized by the Company to its Employees, consultants or independent contractors who are engaged in the conduct of the Business was made in an arm's length transaction. The Company has not entered into any Contract, undertaking or commitment with any such Employee, consultant or independent contractor which was not made in the ordinary course of business of the Company.

(c)    There are no outstanding, pending or, to the knowledge of the Company, threatened: (i) claims, disputes or other controversies between the Company and any of its

26

respective Employees; (ii) unfair labor practice charges or other complaints or grievances against the Company in connection with its operation of the Business; (iii) labor strikes, slowdowns, picketings, work stoppages or other labor disputes against the Company affecting the operation of the Business; or (iv) inspection or prosecution orders against the Business under any labor, employment or occupational health and safety legislation and there is no basis for any such action.

(d)    Section 3.16(d) of the Disclosure Schedule contains a true and complete list of each (i) Benefit Plan, and (ii) any employment, indemnification, consulting or severance agreement, under which any Employee or former Employee has any present or future right to benefits or under which the Company has any present or future liability with respect to Employees or former Employees (collectively, the "*Company's Plans*").

(e)    The Company has made available to Purchaser a complete and current copy of the Company's Plans documents or a written description of any unwritten plan; any trust agreement or insurance contract related to a plan; the most recent employee handbooks, policies and statements of practices and, for each plan subject to ERISA, the most recent summary plan description, the most recent IRS determination letter for each plan intended to be tax-qualified; and the three (3) most recent (i) Forms 5500 and attached schedules, and (ii) audited financial statements.

(f)    The Company has no liability with respect to the Company's Plans and no Encumbrance has arisen under ERISA or the Internal Revenue Code on the Assets and Properties or Business, and no condition or event has occurred or exists with respect to the Company's Plans which could result in an Encumbrance on the Assets and Properties or Business.

(g)    Neither the Company nor any entity that is a member of a controlled group with, under common control with, or otherwise required to be aggregated with, the Company pursuant to Sections 414(b), (c), (m) or (o) of the Code (an "*ERISA Affiliate*") has communicated to present or former Employees of the Company, or formally adopted or authorized for present or former Employees of the Company, any plan not disclosed pursuant to Section 3.16(d) or any change in any existing plan.

(h)    None of the Company's Plans is subject to Section 412 of the Code or Title IV of ERISA, and neither the Company nor any ERISA Affiliate has any outstanding liability with respect to any such plan (contingent or otherwise).

(i)    None of the Company's Plans are a "multi-employer plan" within the meaning of Section 3(37)(A) of ERISA, and the Company does not have any outstanding liability with respect to any such plan (contingent or otherwise).

(j)    The Company is in material compliance with Sections 601 through 608 of ERISA ("*COBRA*").

(k)    Except as set forth in Section 3.16(k) of the Disclosure Schedule, neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement will (either by themselves or in conjunction with any other event within the

27

Company's control): (i) entitle any Employee or other service provider of the Company currently or formerly engaged in the conduct of the Business to severance benefits or any other payment (except Purchase Price as a holder of Company Shares or Company Stock Derivatives) or (ii) accelerate the time of payment or vesting, or increase the amount, of compensation due any such Employee or service provider.

(l)    No person is, or will as a result of the transactions contemplated by this Agreement become, entitled to any payment or benefit from or with respect to the Company which constitutes a "parachute payment" within the meaning of Section 280G of the Internal Revenue Code of 1986 as amended (the "Code").

(m)    The Company does not maintain a "nonqualified deferred compensation plan" within the meaning of Code Section 409A under which any amount is or may become subject to Code Section 409A(1).

Section 3.17    <u>Capitalization and Equity Ownership</u>.    The authorized equity securities of the Company consist of 10,000,000 shares of common stock, par value $0.10 per share, of which 3,293,393 shares of common stock are issued and outstanding, constitute the Company Shares and are held by the Sellers in amounts listed in <u>Schedule 1</u>.  <u>Schedule 1</u> sets forth each holder of any equity interest in the Company, including Company Stock Derivatives and such holder's corresponding ownership amount or right to receive such ownership amount or other payment and any material terms or conditions relating thereto.  The Shareholders are the record and beneficial owners and holders of the Company Shares, free and clear of all Encumbrances, other than restrictions on transfer under applicable state and federal securities Laws and the denial of cumulative voting and preemptive rights to acquire Company Shares. The holders of the Company Stock Derivatives are the record and beneficial owners and holders of the Company Stock Derivatives, free and clear of all Encumbrances, other than restrictions on transfer under applicable state and federal securities Laws. No legend or other reference to any purported Encumbrance appears upon any certificate representing Company Shares, other than restrictions on transfer under applicable state and federal securities Laws and the denial of cumulative voting and preemptive rights to acquire Company Shares.  No legend or other reference to any purported Encumbrance appears upon any document representing Company Stock Derivatives, other than restrictions on transfer under applicable state and federal securities Laws. All of the outstanding Company Shares and Company Stock Derivatives have been duly authorized and validly issued, and in the case of Company Shares are fully paid and non-assessable.  Other than this Agreement and the Ancillary Agreements, there are no Contracts relating to the issuance, sale, or transfer of any Company Shares or Company Stock Derivatives. None of the outstanding Company Shares or Company Stock Derivatives were issued in violation of the Securities Act or any other Law or any preemptive right whether such right was granted by statute or contract.  The Company does not own or have a Contract to acquire any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business.  True and complete copies of all agreements relating to the ownership interest of the shareholders of the Company and relating to the interests of holders of Company Stock Derivatives have been provided to Purchaser, and such agreements have not been amended, modified or supplemented, and there are no agreements to amend, modify or supplement such agreements in any case from the form provided to Purchaser.

28

Section 3.18  Certain Agreements Affected by the Acquisition.  Neither the execution and delivery of this Agreement and the Ancillary Agreements nor the consummation of the transactions contemplated hereby or thereby will (i) result in any payment (including severance, unemployment compensation, golden parachute, bonus or otherwise) becoming due to any Employee, consultant or independent contractor of the Company engaged in the conduct of the Business, (ii) increase any benefits otherwise payable by the Company to any Employee, consultant or independent contractor engaged in the conduct of the Business, or (iii) result in the acceleration of the time of payment or vesting of any such benefits of any Employee, consultant or independent contractor engaged in the Business, except as provided in the Ancillary Agreements.

Section 3.19  Employee Matters.

(a)  Since January 1, 2001, (i) there has been no federal or state claim, including court claims, complaints or charges before a federal or state administration agency, based on sex, sexual or other harassment, age, disability, race, national origin, religion or other discrimination, other statutory claim, complaint or charge relating to employment, whether under federal, state or local law or ordinance, or any common law claim, including claims of wrongful termination, and/or tort claims involving Employees, by any Employee against the Company and there is no fact or circumstance known to the Company that could reasonably be expected to give rise to such a complaint, claim or charge or to result in any Action or Proceeding; and (ii) the Company has not received any notice of any claim that it has not complied in any respect with any Law relating to the employment of any of the Employees, including any provisions thereof relating to wages, hours, collective bargaining, the payment of social security and similar taxes, equal employment opportunity, employment discrimination, reasonable accommodations, family or medical leave, immigration, including IRCA, the WARN Act, employee safety, or that it is liable for any arrearage of wages or any Tax or penalty for failure to comply with any of the foregoing.

(b)  The Company has paid all amounts due to be paid to each Employee other than with respect to any equity interest in the Company.  The Company has not made any deductions from employees' wages except as may be permitted by applicable law.

(c)  There is no pending claim against the Company by any Employee under any workers' compensation plan or policy or for long term disability under any long-term disability plan.  There is no controversy pending or threatened between the Company and any Employee which has or could reasonably be expected to result in an Action or Proceeding.  The Company is not a party to any collective bargaining agreement or other labor union contract nor does the Company know of any activities or proceedings of any labor union or any other Person(s) to organize any Employees.  There has been no work stoppage, strike or other concerted action by any Employees.

(d)  Each Employee engaged in the conduct of the Business is employed at will.  To the knowledge of the Company, no Employee is in violation of any term of any employment contract, patent disclosure agreement, non-competition agreement, or any restrictive covenant to a former employer relating to the right of any such Employee to be employed by the Company, as the case may be, because of the nature of the Business conducted by the Company

29

or to the use of trade secrets or proprietary information of others. No Employee has given notice to the Company, and to the Company's knowledge, no Employee intends to terminate his or her employment with the Company. Section 3.19(d) of the Disclosure Schedule lists each Employee under the heading "Employees," each consultant and independent contractor to the Company engaged in the conduct of the Business under the heading "Consultants and Independent Contractors," and each temporary worker engaged in the conduct of the Business identified as "Temporary", and each such Person's applicable position, and annual compensation (including any bonus or other incentive compensation) as of the date hereof. As of the Closing Date, the Company will have a sufficient number of appropriately trained employees of the Company to continue to conduct the Business as presently conducted.

(e)    To the Company's knowledge, no Employee, no consultant or independent contractor of the Company or temporary worker who is engaged in the conduct of the Business is obligated under any Contract or subject to any Order or Law that would interfere with the conduct of the Business as currently conducted. To the Company's knowledge, neither the execution nor delivery of this Agreement, nor the carrying on of the Business as presently conducted nor any activity of such Employees or consultants in connection with the carrying on of the Business as presently conducted, will conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, or trigger a condition precedent to any rights under any Contract under which any of such Employees, consultants or independent contractors are now bound.

(f)    The Company has completed I-9 forms for all Employees pursuant to the Immigration Reform and Control Act thereby confirming the work eligibility and identity of each Employee. All filings and documents required under the immigration laws with regard to any Employees have been filed, maintained and retained. Neither the Company, nor any Person acting on its behalf has misrepresented a material fact to gain an immigration benefit by, for or on behalf of an Employee.

(g)    The Company has informed all Employees of their rights under the Family and Medical Leave Act ("*FMLA*") or Laws relating to family and medical leave. The Company has provided all eligible Employees with FMLA leave and has returned all Employees taking FMLA leave to the same or a substantially similar job following any FMLA leave.

(h)    Except as disclosed in Section 3.19(h) of the Disclosure Schedule, all Employees of the Company are employed at-will, such that either the Company or the Employee may terminate the employment relationship at any time for any reason.

Section 3.20    Interested Party Transactions.

(a)    Except as disclosed in Section 3.20(a) of the Disclosure Schedule, there are no Contracts, arrangements, understandings, transfers of assets or liabilities or other commitments or transactions, whether or not entered into in the ordinary course of business consistent with past practice, to or by which both the Company and any Affiliate of the Company are parties and that are currently pending or in effect and relate to or affect the Business or any of the Assets and Properties of the Company or affect any Liabilities of the Company.

30

(b)     Each Contract, arrangement, understanding, transfer of assets or liabilities or other commitments or transactions set forth or required to be set forth in Section 3.20(a) of the Disclosure Schedule was entered into, or incurred, as the case may be, on terms and conditions as favorable to the Company as would have been obtainable by the Company in a comparable arm's-length transaction with a Person other than an Affiliate of the Company.

(c)     No Seller, officer, director, partner, member or Employee of the Company (i) owns, directly or indirectly, on an individual or joint basis, any interest in (A) any Assets and Properties of the Company or (B) to the Company's knowledge, any Person that is a supplier, customer or competitor of the Company in connection with the Business (other than through the ownership of one percent (1%) or less of any class of securities registered under the Exchange Act); (ii) to the Company's knowledge, serves as an officer, director or employee of any Person that is a supplier, customer or competitor of the Business; or (iii) has received any loan from or is otherwise a debtor of, or made any loan to or is otherwise a creditor of, the Company.

Section 3.21   Insurance.   Section 3.21 of the Disclosure Schedule contains a complete and correct list of all insurance policies and bonds maintained by the Company related to any of the Assets and Properties of the Company, the Liabilities of the Company or the Business.  There is no claim pending under any such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds other than customary reservation of rights provisions.  Each policy listed in Section 3.21 of the Disclosure Schedule is valid and binding and in full force and effect, all premiums due and payable under all such policies and bonds have been paid and the Company is otherwise in compliance with the terms of such policies and bonds.  Neither the Company nor the Person to whom such policy has been issued has received any written notice of cancellation or termination of, or premium increase with respect to, any such policies.

Section 3.22   Books and Records.   The Books and Records of the Company have been made available to Purchaser or its representatives, and such books and records are complete and correct in all material respects and have been maintained in accordance with sound business practices.  Except as set forth in Section 3.22 of the Disclosure Schedule, the Company's minute books contain a complete and accurate summary of all meetings of directors, shareholders and members, as applicable, or actions by written consent that relate to the Business or the Assets and Properties of the Company, through the date of this Agreement, and reflect all transactions involving the Business or Assets and Properties of the Company referred to in such minutes accurately in all material respects.  Prior to the execution of this Agreement, the Company has delivered to Purchaser true copies of its Articles of Incorporation and Bylaws, both as amended through the date of this Agreement, and true copies of all actions by written consent that relate to the Business or the Assets and Properties through the date of this Agreement.

31

Section 3.23  <u>Brokers' and Finders' Fees; Third Party Expenses</u>.  Neither the Company nor any Seller has incurred, nor will incur, directly or indirectly, any liability for brokerage, finders', or financial advisor's fees or agents' commissions or investment bankers' fees or any similar charges, fees or commissions in connection with this Agreement or any transaction contemplated hereby.

Section 3.24  <u>Customers, Suppliers and Sales Representatives</u>.

(a)     <u>Section 3.24(a)(i) of the Disclosure Schedule</u> lists each customer of the Business that individually accounts for more than One Hundred Thousand Dollars ($100,000) of the consolidated gross revenues of the Business during the twelve (12) month period ended on December 31, 2005, and for more than Fifty Thousand Dollars ($50,000) of the consolidated gross revenues of the Business for the five months ended May 31, 2006, on the basis of revenues collected.  <u>Section 3.24(a)(ii) of the Disclosure Schedule</u> lists the ten (10) largest suppliers of the Business on the basis of cost of goods or services purchased during the twelve (12) month period ended on December 31, 2005 and for the five months ended May 31, 2006.  <u>Section 3.24(a)(iii) of the Disclosure Schedule</u> lists all sales representatives of the Company.  To the Company's knowledge, no such customer, supplier or sales representative is threatened with bankruptcy or insolvency.

(b)     No (i) customer required to be disclosed in <u>Section 3.24(a)(i) of the Disclosure Schedule</u>, (ii) supplier required to be disclosed in <u>Section 3.24(a)(ii) of the Disclosure Schedule</u> or (iii) sales representative required to be disclosed in <u>Section 3.24(a)(iii) of the Disclosure Schedule</u>, has ceased or materially reduced, canceled or otherwise terminated, or made any written threat to the Company to cancel or otherwise terminate its relationship with the Company relating to the Business, or materially decreased its services or supplies to the Company, in the case of any such supplier or sales representative, or its usage of any service or purchase of any product of the Business, in the case of such customer or sales representative (as applicable), and, to the Company's knowledge, no supplier, sales representative, or customer intends to cancel or otherwise terminate its relationship with the Company or to materially decrease its services or supplies to the Company or its usage of the services or products of the Company or to seek a reduction in the price (or a modification of any other material term) on which it purchases services or products of the Business or, in the case of sales representatives, sells products of the Company.  Furthermore, no other contracts, agreements, or letters of understanding detailing a relationship or an arrangement exist between the Company and any customer, supplier or sales representative other than as disclosed in <u>Section 3.24(a) of the Disclosure Schedule</u>.

(c)     Each (i) customer required to be disclosed in <u>Section 3.24(a)(i) of the Disclosure Schedule</u>, (ii) supplier required to be disclosed in <u>Section 3.24(a)(ii) of the Disclosure Schedule</u> or (iii) sales representative required to be disclosed in <u>Section 3.24(a)(iii) of the Disclosure Schedule</u> has transacted business with the Company and otherwise has acted substantially in accordance with the terms of its Business Contract consistent with the established course of conduct or, to the extent there is no Business Contract, its course of performance with the Company over the last twelve (12) months. Each such customer, supplier or sales representative has not sought in writing, or indicated in writing any intention to seek, a material reduction in the prices it currently pays for products and services of the Company or

32

material increase in the price it currently charges the Company for supplier products and services or sales representatives services, as the case may be, or any other material modification of any payment term or other material term applicable to its purchases of products and services of the Company or sales to the Company or sales to the Company's customers, as applicable.

Section 3.25    Contracts and Licenses.

(a)      Section 3.25(a) of the Disclosure Schedule contains a true and complete list of each of the Business Contracts, Business Licenses, Real Property Leases and Personal Property Leases (true and complete copies or, if none, reasonably complete and accurate written descriptions) of which, together with all amendments and supplements thereto and all waivers of any terms thereof, have been delivered to Purchaser prior to the execution of this Agreement (other than employee offer letters).

(b)      Except for the Contracts and Licenses described in Section 3.25(b) of the Disclosure Schedule, the Company is not a party to or bound by any material Contract or License, including:

(i)      any distributor, agency, advertising agency, marketing, manufacturer's or representative sales Contract related to the Business;

(ii)      any continuing Contract for the purchase of materials, supplies, equipment or services for use in connection with the Business which is not subject to cancellation by the Company, or which is subject to cancellation by the other party thereto on sixty (60) or fewer days' notice;

(iii)      any Business Contract or any Contract otherwise binding upon any of the Assets and Properties of the Company or relating to any of the Liabilities of the Company that had or would reasonably be expected to have, either individually or in the aggregate with any other similar Contracts, a Material Adverse Effect on the Business;

(iv)      any Contract related to the conduct of the Business that expires or may be renewed at the option of any Person other than the Company so as to expire more than one year after the date of this Agreement;

(v)      any Contract related to the conduct of the Business that (a) automatically terminates or provides for termination by any Person other than the Company upon consummation of the transactions contemplated by this Agreement or (b) contains any covenant or other provision which limits the Company's ability to compete with any Person in any line of business comprising the Business or in any market, area, jurisdiction or territory;

(vi)      any trust indenture, mortgage, promissory note, loan agreement or other Contract for the borrowing of money, any currency exchange, commodities or other hedging arrangement or any leasing transaction related to the conduct of the Business or binding on the Assets and Properties of the Company of the type required to be capitalized in accordance with GAAP;

(vii)    any Contract for capital expenditures related to the conduct of the Business in excess of Twenty Thousand Dollars ($20,000); or

(viii)    any Contract of guarantee, support, indemnification, assumption or endorsement of, or any similar commitment with respect to, the obligations, or Liabilities of the Company secured by any of the Assets and Properties of the Company.

(c)    All Contracts and Licenses set forth in Section 3.25(b) of the Disclosure Schedule, and all transactions in which the Company has engaged with a customer, supplier or sales representative of the Company, have utilized U.S. Dollars as the underlying currency.

Section 3.26    No Breach of Business Contracts or Business Licenses.  All of the Business Contracts, Business Licenses, Real Property Leases and Personal Property Leases are in written form.  The Company has performed in all material respects all of the obligations required to be performed by it and is entitled to all benefits under, and is not in default, and is not alleged in writing to be in default, in respect of any Business Contract, Business License, Real Property Lease and Personal Property Lease.  Each of the Business Contracts, Business Licenses, Real Property Leases and Personal Property Leases is in full force and effect, and there exists no default or event of default or event, occurrence, condition or act, with respect to the Company or, to the Company's knowledge, with respect to the other contracting party, which, with the giving of notice, the lapse of time or the happening of any other event or conditions, would become a default or event of default under any Business Contract, Business License, Real Property Lease or Personal Property Lease.

Section 3.27    Third Party Consents.  Section 3.27 of the Disclosure Schedule ists (a) all Business Contracts, Business Licenses, Real Property Leases and Personal Property Leases that require a novation or consent in connection with the transactions contemplated hereby, prior to the Closing Date and (b) every Business Contract, Business License, Real Property Lease and Personal Property Lease which, if no novation occurs or if no consent is obtained, would adversely affect the Company's ability to operate the Business in the same manner as the Business was operated prior to the Closing Date.

34

Section 3.28  Solvency. The Company is, and at the time of the consummation of the transactions contemplated herein will be, solvent.  For purposes of this Agreement, "solvent" shall mean that, on the date specified (a) the fair value of the Assets and Properties of the Company shall be greater than the total amount of its Liabilities, including those arising under any Law, Order, Contract, arrangement, commitment or undertaking; (b) the present fair salable value of the Company's Assets and Properties is not less than the amount that will be required to pay the probable debts and liabilities of the Company on its debts as they become absolute and matured in accordance with their stated terms; (c) the Company does not intend to, and does not believe that the Company will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature; and (d) the Company is not engaged in, and is not about to be engaged in, a business or a transaction for which its property would constitute unreasonably small capital.

Section 3.29  Securities Law Matters.

Each Seller receiving any portion of the Purchase Price consideration in Gross Shares:

(a)  acknowledges that the certificates representing the Gross Shares delivered pursuant to this Agreement shall include the following legend, substantially in the form set forth below:

THE SHARES REPRESENTED BY THIS CERTIFICATE (THE "*SHARES*") HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION. NEITHER THE SHARES NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION, EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.  BY THE ACQUISITION HEREOF, THE HOLDER AGREES THAT SUCH HOLDER WILL GIVE EACH PERSON TO WHOM THE SHARES ARE TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.  IN THE CASE OF ANY TRANSFER OR OTHER DISPOSITION MADE OTHERWISE THAN PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT, THE HOLDER HEREOF SHALL BE REQUIRED TO PROVIDE TO THERAGENICS CORPORATION, PRIOR TO SUCH TRANSFER, AN OPINION OF COUNSEL SATISFACTORY TO THERAGENICS CORPORATION THAT SUCH TRANSFER IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION UNDER THE ACT AND IN COMPLIANCE WITH ALL APPLICABLE STATE SECURITIES LAWS.

(b)  understands that the Gross Shares are being issued in reliance on an exemption from the registration requirements of the Securities Act for an offer and sale of

35

securities that does not involve a public offering and has not been registered under the Securities Act or with any securities regulatory authority of any state of the United States or other jurisdiction and, therefore, that such Gross Shares (and all securities issued in exchange therefor or in substitution thereof) cannot be resold in the absence of such registration except pursuant to an exemption from, or in a transaction not subject to, such registration requirements. Each Seller agrees that he or she shall not transfer any of the Gross Shares except in a transaction registered under the Securities Act or unless the Seller shall have provided Purchaser prior written notice of the proposed transfer and delivered to Purchaser an opinion of counsel, which counsel and opinion shall be reasonably satisfactory to Purchaser, that such transfer is being effected in accordance with an available exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

(c)    acknowledges that he or she is (i) an "accredited investor" within the meaning of Rule 501 of the Securities Act, (ii) able to evaluate the merits and risks of an investment in Purchaser, and (iii) able to bear the economic risks of such investment for an indefinite period of time. The information set forth in the Accredited Investor Questionnaire previously provided to Purchaser by each Seller acquiring a portion of the Gross Shares remains true and correct as of the date hereof.

(d)    will acquire his or her portion of the Gross Shares for his or her own account and not with a view to any distribution (within the meaning of the Securities Act) thereof or with any present intention of offering or selling any of such shares in a transaction that would violate the Securities Act or the securities Laws of any state of the United States or any other applicable jurisdiction.

(e)    is not in the business of buying and selling securities.

(f)    acknowledges and agrees that any purported or attempted resale or other transfer of any portion of the Gross Shares which is made other than in compliance with the restrictions stated herein shall not be recognized by Purchaser, and that Purchaser may deliver a corresponding stop-transfer order to Purchaser's transfer agent to that effect.

(g)    has been furnished and has read the (i) Purchaser's Form 10-K for the year ended December 31, 2005, (ii) Purchaser's Form 10-Q for the quarter ended March 31, 2006, (iii) the proxy statement for the annual meeting of Purchaser's stockholders held May 9, 2006, and (iv) each other report or document filed by Purchaser under Sections 13(a), 14(a), 14(c) and 15(d) of the Securities Exchange Act of 1934, as amended, since the filing of Purchaser's most recent Form 10-Q. Each such Seller has been furnished access to such information and documents as such Seller has requested, and has been afforded an opportunity to ask questions of and receive answers from officers of Purchaser concerning the terms and conditions of this Agreement and the business of the Purchaser.

(h)    has been advised by Purchaser to consult his or her own financial, legal and tax advisors with respect to the economic, legal and tax consequences of this Agreement and an investment in the Gross Shares, and has not relied on Purchaser or any of its officers, directors, legal counsel, or financial or other professional advisors for advice or guidance with respect to such consequences. Without limiting the generality of the foregoing, each such Seller

36

has relied solely on the information received from Purchaser and other publicly available information and has not relied on information provided by any other party, including without 'imitation Genesis Capital, l.l.c. and Powell Goldstein, LLP, for the accuracy or due diligence of any of the information provided by the Purchaser. Nothing contained in this Section 3.29(h) shall be construed to absolve Purchaser from any liability for fraud or intentional misrepresentation and no knowledge or information obtained by any Seller as a result of such due diligence shall be deemed to modify or in any way qualify any of the representations and warranties of Purchaser in this Agreement.

Section 3.30    Absence of Certain Business Practices.  None of the Company, and to the knowledge of the Company, any member of the governing board of the Company, officer, Employee, agent, or representative of the Company, or any other Person acting on behalf of the Company, acting alone or together, has (i) received, directly or indirectly, any rebates, payments, commissions, promotional allowances or any other economic benefits, regardless of their nature or type, from any vendor, governmental employee or other Person with whom the Company has done business directly or indirectly, or (ii) directly or indirectly, offered, given or agreed to offer or give any gift or similar benefit to any vendor, governmental employee or other Person who is or may be in a position to help or hinder the Business (or assist the Company in connection with any actual or proposed transaction) which, in the case of either clause (i) or clause (ii) above, would reasonably be expected to subject the Company to damage or penalty in any civil, criminal or governmental Action or Proceeding.

Section 3.31    Disclosure of Certain Financial Relationships.  The Company has disclosed to Purchaser any and all financial relationships (whether or not memorialized in a writing) that the Company has had with a physician or an immediate family member of a physician.  For purposes of this Section 3.31, the term "financial relationship" has the meaning set forth in 42 U.S.C. § 1395nn.

Section 3.32    Real Property.  The Company does not own any real property and does not lease any real property other than pursuant to the Real Property Leases.

Section 3.33    Representations Complete.    None of the representations or warranties made by the Sellers or the Company herein, and none of the statements, representations or warranties contained in the Disclosure Schedule or in any certificate, list or other writing furnished to Purchaser by the Company and the Sellers pursuant to this Agreement or any of the Ancillary Agreements, when all such documents are read together in their entirety, contain any untrue statement of a material fact, or omit to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading. It is the explicit intent of each party hereto that the Sellers and the Company are making no representations or warranties except as set forth in this Agreement, the Ancillary Agreements, the Disclosure Schedule, and the certificates, documents and instruments delivered in connection herewith or therewith, and except further that nothing in this sentence shall be construed to absolve the Sellers or the Company from liability for fraud or intentional misrepresentation.

37

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to the Sellers and the Company to enter into this Agreement and consummate the transactions contemplated herein, Purchaser hereby represents and warrants to the Sellers and the Company that the statements set forth in this Article IV are true and correct.

Section 4.01    Organization, Standing and Power.    Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the state of its incorporation. Purchaser has the corporate power and authority to own, use, license, lease and operate its respective properties and to carry on its respective business as it is now being conducted and as currently proposed to be conducted and is duly qualified, licensed or admitted to do business and is in good standing in each jurisdiction in which the ownership, use, licensing, leasing or operation of its properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary.

Section 4.02    Authority.    Purchaser has all requisite corporate power and authority to enter into, execute and deliver this Agreement and the other Ancillary Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate action on the part f Purchaser. This Agreement has been, and the Ancillary Agreements to which Purchaser is a party will be, duly executed and delivered by Purchaser. This Agreement constitutes, and the other Ancillary Agreements to which Purchaser is a party, when executed and delivered as contemplated by this Agreement, will constitute, assuming the due authorization, execution and delivery by each of the other parties hereto and thereto, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy and insolvency Laws, the rights of creditors generally, and general principles of equity.

Section 4.03    No Conflict.    The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements to which Purchaser is a party do not, and the consummation by Purchaser of the transactions contemplated hereby and thereby do not and will not (i) conflict with or violate any provision of the Certificate of Incorporation or Bylaws of Purchaser, (ii) conflict with or violate in any material respect any Law applicable to Purchaser or by which any of its Assets and Properties is bound, or (iii) result in any breach of or constitute a default (or an event which with the giving of notice or lapse of time or both could reasonably be expected to become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, any material note, bond, mortgage, indenture, Contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Purchaser is a party or by which any of its Assets and Properties is bound so as to impair the ability of Purchaser to carry out its obligations under, or to prevent or delay the completion of the transactions contemplated by, this Agreement.

38

Section 4.04   Financial Resources.  Purchaser has sufficient cash on hand to pay, and borrowing capacity under committed lines of credit to finance, the cash portion of the Purchase Price.

Section 4.05   SEC Filings; Financial Statements.

(a)      Purchaser has filed all reports required to be filed by it with the SEC under Section 13(a) of the Exchange Act since June 30, 2005 (collectively, together with any such reports Purchaser may file subsequent to the date hereof until the Closing Date, the "*Purchaser SEC Reports*"). Each Purchaser SEC Report (i) complied as to form in all material respects with the requirements of the Exchange Act as of its filing date, and (ii) did not at the time it was filed (or, if amended, supplemented or superseded, then as of the date of the last such amendment, supplement or superseding filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(b)      Except as is provided in the Purchaser SEC Reports, each of the consolidated financial statements (including, in each case, any notes thereto) contained in the Purchaser SEC Reports complied as to form in all material respects with applicable accounting requirements, was prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and each presented fairly the consolidated financial position of Purchaser and the consolidated Subsidiaries of Purchaser as of the respective dates thereof and the consolidated results of operations and cash flows of Purchaser and the consolidated Subsidiaries of Purchaser for the respective periods indicated therein, except as otherwise noted therein (subject, in the case of unaudited statements, to normal year-end adjustments).

Section 4.06   Absence of Certain Changes or Events.  Except as disclosed in the Purchaser SEC Reports, since December 31, 2005, there has not occurred (i) any amendment or change to the Certificate of Incorporation or Bylaws of Purchaser, (ii) any damage to, or destruction or loss of any Assets or Properties of Purchaser that resulted in a Material Adverse Effect on Purchaser, or (iii) any other change, event or condition that has had a Material Adverse Effect on Purchaser.

Section 4.07   Valid Issuance.  The Gross Shares to be issued pursuant to Article II, when issued in accordance with this Agreement, will be duly authorized, validly issued, fully paid and non-assessable and not subject to preemptive rights or similar contractual rights granted by Purchaser. Upon receipt of his allocable portion of the Gross Shares, each Seller will acquire good and valid title to such shares of common stock, free and clear of any and all liens, claims, security interests, encumbrances, restrictions on voting or alienation or otherwise, or adverse interests, except as may be created by such Seller, or by applicable securities Laws.

39

SCHEDULE 1

| Name of Shareholder | Address | Accredited/Unaccredited | Number of Golf Shares Owned | Phantom Shares Issued | | Total Shares Owned | Percentage Ownership | Pro Rata Allocation of Purchase Price | Pro Rata Escrow Amount | Number of Transferred Shares in Escrow | Cash in Escrow | Withholding | Total Cash due at Closing | method of payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lester V. Baum | 6000 North Central Expwy, Suite 1390, Dallas, TX 75206 | Unaccredited | 50,000 | | 0.0184418 | 50,000 | 1.84425% | 359,024.81 | 55,952.46 | 17,194 | 0 | | 603,122.16 | |
| Lester V. Baum, Trustee of 1993 Michael L. Baum Trust | 6000 North Central Expwy, Suite 1390, Dallas, TX 75206 | Unaccredited | 22,000 | | 0.000130970 | 22,000 | 0.81311% | 208,468.85 | 20,844.90 | 0 | 20,844.90 | 0 | 187,604.97 | |
| Lester V. Baum, Trustee of 1993 Brian E. Baum Trust | 6000 North Central Expwy, Suite 1390, Dallas, TX 75206 | Unaccredited | 22,000 | | 0.000120917 | 22,000 | 0.81311% | 208,468.85 | 20,844.90 | 0 | 20,844.90 | 0 | 187,604.97 | |
| Wynn Browning | 6416 Dykes Way, Dallas, TX 75230 | Accredited | 50,000 | | 0.010120917 | 50,000 | 1.67211% | 568,498.00 | 56,849.09 | 17,455 | 0 | | 511,649.84 | |
| David G. Catlin | 41 Lantana Drive, Heath, TX 75032 | Accredited | 200,000 | 250,000 | 0.124404224 | 450,000 | 16.5404% | 4,263,747.03 | 426,374.70 | 120,810 | 0 | 874,457.60 | 3,062,904.63 | |
| Swanta G. Eidlesg | 655 44th Street, Des Moines, IA 50312 | Accredited | 271,098 | | 0.070551894 | 271,098 | 7.55429% | 2,989,348.96 | 268,934.86 | 78,856 | 0 | | 2,311,613.21 | |
| Chelrs B. McFarland | 2235 Wood Avenue, Houston, TX 77030 | Accredited | 178,000 | | 0.049904277 | 178,000 | 4.9004% | 1,986,546.63 | 198,654.86 | 51,762 | 0 | | 1,617,693.04 | |
| John H. McFarland | 3235 Wood Avenue, Houston, TX 77030 | Accredited | 8,667 | | 0.001493735 | 8,667 | 0.11883% | 63,189.70 | 6,318.99 | 1,940 | 0 | | 56,852.80 | |
| Van E. McFarland, III | 1743 Heatley, Houston, TX 77003 | Unaccredited | 8,667 | | 0.001101668 | 8,667 | 0.18192% | 63,190.31 | 6,318.02 | 1,929 | 0 | | 56,844.29 | |
| Klan Interests, Ltd. | 2475 Merritt Drive, Garland, TX 75041 | Accredited | 2,099,204 | | 0.588051292 | 2,099,204 | 56.55911% | 18,091,744.00 | 1,809,174.43 | 618,738 | 0 | 9,318.99 | 17,902,569.97 | |
| Joseph Kunz | 10001 Laurel Oaks Drive, Austin, TX 78701 | Accredited | 8,000 | | 0.000222841 | 8,000 | 0.2222% | 73,379.85 | 7,579.99 | 2,327 | 0 | | 68,219.95 | |
| William E. Kunz | 10001 Laurel Oaks Drive, Austin, TX 78724 | Unaccredited | 2,400 | | 0.000008822 | 2,400 | 0.0883% | 22,733.96 | 2,274.00 | 0 | 2,274.00 | | 20,685.99 | |
| Glenn Leightenwood | 22119 E. Chrysalyn, Suite 100, Austin, TX 78731 | Accredited | 13,273 | | 0.000388628 | 13,273 | 0.3888% | 125,700.54 | 12,570.05 | 3,882 | 0 | | 113,202.48 | |
| Abdon Martinez | 900 Willow Glen, Garland, TX 75043 | Unaccredited | 50,000 | | 0.013832914 | 50,000 | 1.3831% | 473,749.67 | 47,374.97 | 0 | 47,374.97 | | 426,374.70 | |
| Gene L. Jameson | 17401 Malaga Parkway, Suite 211, Dallas, TX 75287 | Accredited | 20,000 | | 0.009208528 | 20,000 | 0.5573% | 189,499.87 | 18,949.99 | 5,818 | 0 | | 170,549.89 | |
| Harold L. Bretteam, M.D. | 210 La Jolla, Aledo, TX 76008 | Unaccredited | 60,000 | | 0.016729377 | 60,000 | 1.6721% | 568,499.80 | 56,849.80 | 17,455 | 0 | | 511,649.84 | |
| William J. Ulshen | 2408 Balboa Drive, Carrollton, TX 75009 | Accredited | 18,256 | | 0.000089071 | 18,256 | 0.5098% | 172,894.43 | 17,289.44 | 17,289.44 | 0 | | 155,604.99 | |
| Jeannette Von Devander, Trustee, West Texas Trading Co. Pension Plan | 6000 Candle Ridge Cove, Austin, TX 78731 | Unaccredited | 20,000 | | 0.005872626 | 20,000 | 0.5574% | 189,499.87 | 18,949.99 | 0 | 18,949.99 | | 170,549.89 | |
| Kevin Sullivan | 3225 Bryan Avenue Court, Ames, IA 50014 | Accredited | 50,000 | | 0.013332914 | 50,000 | 1.3824% | 473,749.67 | 47,374.97 | 14,545 | 0 | | 426,374.70 | |
| Amanda Edelson | 3843 H. Hall Street, Dallas, TX 75219 | Accredited | 50,000 | | 0.013332914 | 50,000 | 1.3831% | 473,749.67 | 47,374.97 | 14,545 | 0 | | 426,374.70 | |
| Virginia Pene | 3834 Bentley Drive, Amarillo, TX 79109 | Unaccredited | 50,000 | | 0.013832914 | 50,000 | 1.3834% | 473,749.67 | 47,374.97 | 0 | 47,374.97 | | 426,374.70 | |
| Angela M. Walther | 10103 Van Heusen Drive, Dallas, TX 75243 | Accredited | 20,000 | 10,000 | 0.009366028 | 30,000 | 0.82652% | 284,249.80 | 28,424.98 | 8,727 | 0 | 26,132.83 | 229,952.29 | |
| Celia Rodriguez | 412 Mason, Dallas, TX 75751 | Unaccredited | 10,000 | 10,000 | 0.002780793 | 20,000 | 0.62817% | 94,749.92 | 9,474.99 | 0 | 9,474.99 | 29,231.21 | 59,043.73 | |
| Samuel L. Austin | 10421 FM 2769, Volente, TX 78641 | Unaccredited | 10,000 | | 0.002786793 | 10,000 | 0.27917% | 94,749.93 | 9,474.99 | 0 | 9,474.99 | 29,009.01 | 66,286.93 | |
| Michael D. Vaughn | 2716 Bent Oaks, Garland, TX 75043 | Unaccredited | 10,000 | 10,000 | 0.002786793 | 20,000 | 0.27917% | 94,749.92 | 9,474.99 | 0 | 9,474.99 | 29,041.70 | 58,233.16 | |
| Leanne Hart | 75 Powder Horn Court, Sharpsburg, GA 30277 | Shareholder | 8,000 | 8,000 | 0.001303391 | 8,000 | 0.18974% | 47,214.97 | 4,737.90 | 0 | 4,737.90 | 15,487.83 | 27,190.54 | |
| Total | | | 3,295,393 | 288,000 | 100% | 3,586,393 | 100.0000% | 34,000,000.00 | 3,400,000.00 | 976,096 | 214,442.79 | 703,349.82 | 29,096,715.00 | |

10% 3,186,357.21
10% 214,442.79

Net 2,695,713.00

(703,286.92)

Section 4.08    Litigation; Regulatory Compliance.    There is no private or governmental Action or Proceeding pending, or, to the knowledge of Purchaser, threatened by or against Purchaser, in which Purchaser is named as a party or is otherwise directly involved, relating to the Assets and Properties of Purchaser or the operation of the business of Purchaser, and no judgment, decree or Order applicable to Purchaser or any of the Assets and Properties of Purchaser, that could reasonably be expected to prevent, enjoin, alter or delay any of the transactions contemplated by this Agreement or the Ancillary Agreements or to have a Material Adverse Effect on the business of Purchaser.

Section 4.09    Due Diligence.    Purchaser was provided the opportunity to conduct full and complete due diligence on the Company and the Business, including an opportunity for the Purchaser to make specified telephone calls, interview or meet with the key customers of the Company set forth on Purchaser Schedule 4.09, and as of the date hereof, Purchaser has performed such due diligence.    To the knowledge of Purchaser, Purchaser has received all responsive information requested from the Company with respect to the Company and the Business. Nothing contained in this Section 4.09 shall be construed to absolve the Sellers' and the Company's liability for fraud or intentional misrepresentation and no knowledge or information obtained by Purchaser as a result of such due diligence shall be deemed to modify or in any way qualify any of the representations and warranties of Sellers and the Company in this Agreement.

Section 4.10    Solvency.    The Purchaser is, and at the time of the consummation of the transactions contemplated herein after giving effect thereto, will be, solvent. For purposes of this Agreement, "solvent" shall mean that, on the date specified (a) the fair value of the Assets and Properties of the Purchaser shall be greater than the total amount of its Liabilities, including those arising under any Law, Order, Contract, arrangement, commitment or undertaking; (b) the present fair salable value of the Purchaser's Assets and Properties is not less than the amount that will be required to pay the probable debts and liabilities of the Purchaser on its debts as they become absolute and matured in accordance with their stated terms; (c) the Purchaser does not intend to, and does not believe that the Purchaser will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature; and (d) the Purchaser is not engaged in, and is not about to be engaged in, a business or a transaction for which its property would constitute unreasonably small capital.

Section 4.11    Required Registration.    Purchaser is eligible to register Registrable Securities on Form S-3 under the Securities Act.

40

Section 4.12   <u>No Further Representations</u>.   Notwithstanding anything to the contrary contained in this Agreement, it is the explicit intent of each party hereto that Purchaser 's making no representation or warranty whatsoever, express or implied, except as set forth in this <u>Article IV</u>, the Ancillary Agreements, and the certificates, documents and instruments delivered in connection herewith or therewith, and except further that nothing in this sentence shall be construed to absolve Purchaser from liability for fraud or intentional misrepresentation.

# ARTICLE V

## COVENANTS AND AGREEMENTS

Section 5.01   <u>Public Announcements</u>.   Purchaser, on the one hand and Eddings on the other hand, shall consult with each other before issuing any press release or otherwise making any public statements with respect to the Agreement or the transactions contemplated hereby and, until the first anniversary of the date hereof, will not issue any such press release or make any such public statement that is not approved by the other party, except as may be required by Law or applicable stock exchange rules, in which case the parties shall make reasonable efforts to consult with each other prior to the making of such public statement.

Section 5.02   <u>Assistance and Cooperation</u>.   After the Closing Date, Purchaser shall become primarily responsible for (i) filing the Company's audited financial statements for the year ended December 31, 2005 with the SEC; and (ii) preparing and filing all Tax Returns of the Company due after the Closing Date; *provided, however,* that Purchaser, the Sellers and the Company shall (and shall cause their respective Affiliates and Representatives to):  (a) assist the other party in assembling financial information for the year ended December 31, 2005 and preparing any Tax Returns which such other party is responsible for preparing and filing related to the Company; (b) cooperate fully in preparing for any audits of, or disputes with any Taxing Authority regarding, any Tax Returns of the Company; (c) make available to the other and to any Taxing Authority as reasonably requested all information, records, and documents relating to financial information for the year ended December 31, 2005 and Taxes of the Company; (d) provide timely notice to the other in writing of any pending or threatened Tax audit or assessments of the Company for taxable periods for which the other may have liability under this Agreement; and (e) furnish the other with copies of all correspondence received from any Taxing Authority in connection with any Tax audit with respect to any taxable period for which the other may have liability under this Agreement.   In the event of any Tax audit with respect to the Company, the Sellers and the Company shall not negotiate and settle with the applicable Taxing Authority without the written consent of Purchaser.

41

Section 5.03   Consent of Auditors.   The Sellers and the Company acknowledge that Purchaser will require the written consent of Hartman Leito & Bolt, LLP for inclusion in Form 8-K containing the Company's December 31, 2005 audited financial statements, and may require the written consent of Hartman Leito & Bolt, LLP to the inclusion of the Company's audited financial statements in any registration statements that Purchaser may file under the Securities Act, through the date of filing of Purchaser's Annual Report on Form 10-K for the year ending December 31, 2007. Eddings and Angela Walters agree to use their reasonable efforts in assisting Purchaser in obtaining any required written consents from Hartman Leito & Bolt, LLP.

Section 5.04   Employee Benefit Plans.   The Parties acknowledge and agree that the Purchaser may desire for the termination of certain of the Company's employee benefit plans set forth on Section 3.16(d) of the Disclosure Schedule.   In the event Purchaser desires to terminate any of such employee benefit plans (which indication shall be in writing), the Company and Eddings hereby agree to use all commercially reasonable efforts to effect such termination, provided that Purchaser pays all termination fees incurred as a result thereof.

Section 5.05   Sellers' Representative.   The Sellers, by their execution of this Agreement, hereby designate Eddings as their representative (the "*Sellers' Representative*"). In case of Eddings' death or disability, the Sellers shall designate an alternate Sellers' Representative within 10 days of such event. The Sellers shall be bound by any and all actions taken by the Sellers' Representative with respect to all matters arising under this Agreement, the Escrow Agreement and the Registration Rights Agreement, as well as in resolving all disputes or other issues between Purchaser and the Sellers arising hereunder or thereunder at or following Closing.   The Sellers authorize the Sellers' Representative to reimburse himself from distributions received by him from the Escrow Fund for all costs, expenses and payments incurred by him in his capacity as Sellers' Representative.   The Sellers' Representative shall be indemnified from and against any and all claims, demands, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees), arising from or related to any acts undertaken (and any omissions to act) in his capacity as Sellers' Representative, except to the extent attributable to Sellers' Representative's gross negligence or willful misconduct.   The Sellers, by their approval of the transactions contemplated in this Agreement, agree to bear the costs of such expense reimbursement and indemnification on a pro-rata basis in accordance with their pro rata fully-diluted equity interest in the Company immediately prior to the Closing. Purchaser shall be entitled to rely upon any communication or writings given or executed by the Sellers' Representative.   All notices to be sent to Sellers pursuant to this Agreement may be addressed to the Sellers' Representative and any notice so sent in accordance with Section 8.01 shall be deemed notice to all of the Sellers.

Section 5.06   Approval of Payments.   Each Shareholder hereby approves the payment of a portion of the Purchase Price to the holders of the Company Stock Derivatives, each of whom is an Employee, in the amount for each such holder set forth on Schedule 1.

Section 5.07   Approval of Schedule 1.   Each Seller hereby acknowledges and approves the accuracy of Schedule 1, as it pertains to each such Seller.

# ARTICLE VI

## CLOSING DELIVERABLES

Section 6.01   Deliveries of the Purchaser.

As of the Closing Date, the Company and the Sellers shall have received from Purchaser the following documents:

(a)      a certificate of existence and good standing from the state of incorporation as to the corporate status of Purchaser dated not earlier than ten (10) days prior to the Closing Date;

(b)      a certificate executed by the Secretary or Assistant Secretary of the Purchaser as to a true and complete copy of the resolutions, adopted by the Board of Directors of Purchaser, authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which Purchaser is a party and all transactions contemplated hereby and thereby;

(c)      a certificate from the Secretary or Assistant Secretary of Purchaser as to the incumbency and signatures of the officers who will execute documents at the Closing or who have executed this Agreement;

(d)      a certified copy of the Certificate of Incorporation of Purchaser issued by Purchaser's state of incorporation;

(e)      a certificate from the Secretary or Assistant Secretary of Purchaser that such Certificate of Incorporation has not been amended since the date of issuance of such certified copy;

(f)      a copy of an executed Escrow Agreement, which shall be in full force and effect;

(g)      evidence of all corporate approvals of Purchaser required for the lawful consummation of the transactions contemplated by this Agreement and the Ancillary Agreements to which Purchaser is a party, which shall be in full force and effect;

(h)      a legal opinion from Powell Goldstein LLP, outside legal counsel to Purchaser, in substantially the form of Exhibit C hereto; and

43

(i)      such other documents and instruments (if any) as the Company and Sellers may reasonably request in order to effectuate the transactions contemplated by this \greement.

Section 6.02    Deliveries of the Sellers and the Company.

As of the Closing Date, the Purchaser shall have received from the Sellers and the Company the following documents:

(a)      a legal opinion from Hallett & Perrin, P.C., outside legal counsel to the Company, substantially in the form of Exhibit D hereto;

(b)      evidence that all consents and waivers of third parties and novations and amendments to Contracts set forth in Section 3.27 of the Disclosure Schedule shall have been obtained;

(c)      Certificates, duly endorsed (or accompanied by duly executed stock powers);

(d)      Intellectual Property Assignment Agreements executed by the following Employees of the Company: Michael Vaughn, Samuel Austin, Eddings and David Catlin; substantially in the form of Exhibit E;

(e)      the Eddings Employment and Non-Competition Agreement, the Angela Walters Employment and Non-Competition Agreement, the David Catlin Employment and Non-Competition Agreement, the David Ozinga Employment and Non-Competition Agreement, and .he Lauren Hart Employment and Non-Competition Agreement, the Frank Gerome Employment and Non-Competition Agreement, signed and executed by each of Eddings, Angela Walters, David Catlin, David Ozinga, Lauren Hart and Frank Gerome, respectively, substantially in the form of Exhibits F-1, F-2, F-3, F-4, F-5, and F-6 hereto, and each of the foregoing agreements in such form shall be in full force and effect;

(f)      evidence of landlord consent to this transaction for the property located at 2220 Merritt Drive, Garland, Texas 75041 in substantially the form of Exhibit G hereto;

(g)      a copy of the Escrow Agreement executed by the Sellers' Representative on behalf of the Sellers, which agreement shall be in full force and effect;

(h)      a certificate of existence and good standing from the state of incorporation as to the corporate status of the Company;

(i)      a true and complete copy of the Articles of Incorporation of the Company and all amendments thereto certified by the Secretary thereof;

(j)      a true and complete copy of the Bylaws of the Company certified by the Secretary thereof;

44

(k)    a copy of the financial statements previously issued by Hartman Leito & Bolt, LLP which have been prepared as of and for the year ended December 31, 2005 in accordance with Regulation S-X of the Securities Exchange Act of 1934. The Purchaser will be responsible for Hartman Leito & Bolt, LLP's costs incurred by the Company and directly related to any required modifications related to the year ended December 31, 2005. Notwithstanding the foregoing, the Sellers will be responsible and hold the Purchaser harmless for any costs or expenses of Hartman Leito & Bolt, LLP related to the correction of any errors or omissions discovered in such financial statements which are identified in writing by Hartman Leito & Bolt, LLP;

(l)    Evidence that the Company has paid all Indebtedness and satisfied all obligations owed to its creditors necessary to release all Encumbrances, and otherwise permit the Purchaser to obtain clear title to the Assets and Properties, or the Company shall have obtained payoff letters and releases from such creditors, in form and substance reasonably satisfactory to the Purchaser, which contain payoff and release information with respect to the satisfaction of such obligations and the release of all such Encumbrances, and provided such payoff letters to the Purchaser;

(m)    copies or originals of all of the Real Property Leases, the Personal Property Leases, the Business Contracts and the Business Licenses, and the Company shall make available to Purchaser at the locations at which the Business is conducted, all of the other Books and Records of the Company, and deliver or make available to Purchaser at the locations at which the Business is conducted all other Assets and Properties of the Company;

(n)    an executed agreement of each holder of Company Stock Derivatives relating to the cancellation, retirement and cessation of existence of all of the holder's Company Stock Derivatives as contemplated by Section 2.02 hereto and releasing all claims, in the form of Exhibit H hereto;

(o)    a copy of an executed Litigation Trust Agreement, in substantially the form of Exhibit I hereto; and

(p)    such other documents and instruments (if any) as Purchaser may reasonably request in order to effectuate the transactions contemplated by this Agreement and the Ancillary Agreements.

## ARTICLE VII

## SURVIVAL, INDEMNIFICATION AND ESCROW

Section 7.01  Survival.  The covenants, obligations, representations and warranties of Purchaser, Sellers, and the Company contained in this Agreement, or in any document delivered pursuant to this Agreement, shall be deemed to be material and to have been relied upon by the parties hereto notwithstanding any investigation prior to the Closing and shall survive the date of Closing until the termination of the Escrow Agreement; and shall not be merged into any documents delivered in connection with the Closing; *provided, however,* that the covenants, obligations, representations and warranties of Purchaser, Sellers, and the

45

Company regarding (a) power and authority to enter into this Agreement and the Ancillary Agreements (Sections 3.01, 3.02, 4.01 and 4.02), (b) title to assets and Company Shares (Section 35), (c) compliance with Laws (Section 3.09), (d) Taxes (Section 3.15), (e) Intellectual Property (Section 3.13), and (f) capitalization (Section 3.17), shall survive the date of Closing indefinitely.

Section 7.02   Escrow Fund.  On or as soon as reasonably practicable after the Closing Date, in accordance with Section 2.04, the Escrow Amount shall be deposited with U.S. Bank National Association (or its successor in interest or other institution selected by Purchaser with the consent of the other parties to the Escrow Agreement, which consent shall not be unreasonably withheld), as escrow agent (the "*Escrow Agent*").   The Escrow Amount so deposited, together with interest and other income thereon, if any, shall constitute the "*Escrow Fund*" and shall be governed by the terms set forth in this Agreement and in the Escrow Agreement.   The Escrow Fund shall be the sole source of funds available to compensate Purchaser pursuant to the indemnification obligations of the other parties hereto, including any indemnification claim made by Purchaser under this Article VII; *provided, however,* that the limitations contained this Section 7.02 shall not apply to recovery for inaccuracy in or breach of a representation, warranty or obligation contained in Sections 3.01, 3.02, 3.05(c), and 3.17 or a claim based on willful misconduct or fraud. Any claim for indemnification paid from the Escrow Fund for breach by a Seller of the representations and warranties contained in Sections 3.02, 3.03, 3.04, 3.05(c), 3.20(c), 3.23, 3.29, and 3.33 shall be charged first to the amounts contributed to the Escrow Fund on behalf of the breaching Seller, and thereafter to the remaining Escrow Fund.   The Escrow Agreement shall have a term of two (2) years and shall provide for the release of one half (1/2) of the Escrow Fund on the first anniversary thereof, net of the estimated value of any asserted claims, which estimated value shall be withheld from the amount released, and the remaining one half (1/2) on the second anniversary thereof, also net of the estimated value of asserted claims, which estimated value shall be withheld from the amount released.

Section 7.03   Indemnification.

(a)   Indemnification by the Sellers from the Escrow Fund.  From and after the Closing Date, subject to the limitations set forth in this Article VII and solely from the Escrow Fund, the Sellers promptly shall indemnify, defend and hold harmless (and upon demand shall reimburse) Purchaser and the directors, officers, shareholders, employees, Affiliates and agents of Purchaser, respectively (the "*Indemnified Parties*"), against any and all claims, actions, demands, suits, proceedings, assessments, judgments, losses, costs, and expenses (including Legal Expenses) and other damages (individually and collectively a "*Loss*") resulting from (i) any breach by the Sellers or the Company of any of its covenants, obligations, representations or warranties or breach or untruth of any covenant, obligation, representation, warranty, fact or conclusion contained in this Agreement, any Ancillary Agreement or any document delivered pursuant to which it is a party, (ii) any action, claim or investigation relating to or arising out of the ownership, licensing, operation, action, inaction or conduct of the Business, or any of the Assets or Properties related to the Business, relating to all periods of time prior to Closing, and (iii) any and all Taxes imposed on or against the Company as a result of any failure to either (1) properly withhold any such Taxes on any payments made by the Company to any Person prior to the Closing Date or (2) report properly on any such payments on a Tax Return, including the reporting of such payments on an incorrect Tax Return.  Any indemnification payment pursuant

46

to the foregoing shall include interest at a rate equal to eight percent (8%) (the "*Rate*") from the date the loss, costs, expenses or damages were incurred until the date of payment; *provided, however*, the Rate shall not be payable with respect to attorneys' fees incurred until such date as the underlying claim is determined to be payable. Notwithstanding the foregoing, (i) if all individual Losses do not exceed One Hundred Twenty Five Thousand Dollars ($125,000) in the aggregate, they shall not be deemed to be Losses for which indemnification is required under this Section 7.03(a) and (ii) in no event shall the Sellers be responsible for any Losses in excess of, in the aggregate, the amount of the Escrow Fund at any given time, and Purchaser shall look solely to the Escrow Fund for reimbursement of Losses, the Sellers having no additional personal liability therefor; *provided, however*, that once the One Hundred Twenty Five Thousand Dollar ($125,000) threshold is exceeded, Losses shall include the first dollar of Loss. The limitations contained this Section 7.03(a) shall not apply to recovery for inaccuracy in or breach of a representation, warranty or obligation contained in Sections 3.01, 3.02, 3.05(c), and 3.17 or a claim based on willful misconduct or fraud.

(b)    Indemnification by Purchaser.

(i)    Purchaser shall promptly indemnify, defend, and hold harmless (and upon demand shall reimburse) the Sellers against any Loss resulting from (i) any breach by Purchaser of any of its covenants, obligations, representations or warranties or breach or untruth of any covenant, obligation, representation, warranty, fact or conclusion contained in this Agreement or any certificate or document of Purchaser delivered pursuant to this Agreement, and (ii) any claim arising out of the conduct of the Business after Closing, except for failure to obtain consents, if any, for the assignment of the Contracts and except those directly or indirectly resulting solely from a breach by the Company or the Sellers of any representations or covenants of this Agreement. Any indemnification payment pursuant to the foregoing shall include interest at the Rate from the date the loss, costs, expenses or damages were incurred until the date of payment; *provided, however*, the Rate shall not be payable with respect to attorneys' fees incurred until such date as the underlying claim is determined to be payable.

(ii)    Notwithstanding anything in this Agreement to the contrary, the Company and each Seller agree that (i) to the extent the Company, any Seller or any of their respective Affiliates have incurred any losses or damages in connection with this Agreement, (A) the maximum aggregate liability of Purchaser and its respective Representatives and Affiliates for such losses or damages, if liable therefor, will be limited to an amount equal to Five Hundred Thousand Dollars ($500,000) in the aggregate, except liability for fraud or intentional misconduct and (B) in no event will the Company, any Seller or any of their respective Affiliates seek to recover any money damages in excess of such amount from Purchaser, or its respective Representatives and Affiliates in connection therewith. The limitation contained in this Section 7.03(b) shall not apply to recovery for inaccuracy in or breach of a representation or warranty contained in Section 4.07.

Section 7.04    Procedure for Indemnification.

(a)    Notice. Within thirty (30) days (or, if sooner, at least five (5) Business Days before an answer or response is due) after receipt of written or actual notice of any action or claim (the "*Claim*") as to which it asserts a right to indemnification, the party seeking

47

indemnification hereunder (the "*Indemnitee*") shall give written notice thereof (the "*Notice*") to the Person from whom indemnification is sought (the "*Indemnitor*"), provided that the failure of the Indemnitee to give the Indemnitor notice within the specified number of days shall not relieve the Indemnitor of any of its obligations hereunder, but may create a cause of action for breach for damages directly attributable to such delay. Indemnitor shall be liable to Indemnitee with respect to Losses only so long as Indemnitee gives Indemnitor written notice thereof prior to the expiration of the survival periods set forth in Section 7.01.

      (b)      Third Party Claims.

      (i)      If any claim for indemnification by Indemnitee arises out of a Claim by a Person other than Indemnitee, the Indemnitor shall be entitled to assume the defense thereof, by written notice to the Indemnitee within fifteen (15) days after receipt of the Notice. Indemnitor shall thereupon take all steps or commence proceedings to defeat or compromise any such Claim, including retaining counsel reasonably satisfactory to the Indemnitee. Except as otherwise provided herein, all costs, fees and expenses with respect to any such Claim shall be borne by Indemnitor. If the Indemnitor assumes the defense of a Claim, it shall not settle such Claim unless such settlement includes as an unconditional term thereof a release by the claimant of the Indemnitee, reasonably satisfactory to the Indemnitee except that Indemnitor shall not, without the prior written consent of Indemnitee, directly or indirectly require Indemnitee to take or refrain from taking any action, or make any public statement, or consent to any settlement, which it reasonably considers to be against its interest. Indemnitee shall have the right to participate at its own expense, in such proceedings, but control of such proceedings shall remain exclusively with Indemnitor.

      (ii)      If the Indemnitor shall fail to notify the Indemnitee of its desire to assume the defense of any such claim or action within the prescribed period of time, then the Indemnitee may assume such defense in such manner as it may deem appropriate, and the Indemnitor shall be bound by any determination made or any settlement thereof effected by the Indemnitee. The Indemnitor shall be permitted, at its own expense, to join in such defense and to employ its own counsel but control of such proceedings shall remain exclusively with Indemnitee.

      (iii)      Indemnitor and Indemnitee agree to make available to each other, their counsel and other representatives, all information and documents reasonably available to them reasonably requested by the other which relate to any such claim or action, and to render to each other such reasonable assistance as may be reasonably requested in order to insure the proper and adequate defense of such claim or action, but any costs or expenses related thereto shall be borne by Indemnitor; and provided that any failure (after written notice with specificity and an opportunity to cure) shall not relieve the Indemnitor of any of its obligations hereunder but may create a cause of action for breach for damages directly attributable to such failure.

      (c)      Other Claims.  In the event of any Claim other than those provided for in subsection (b) hereof, Indemnitee shall be entitled to indemnification as provided herein.

      (d)      Payment of Claims.  Amounts payable by the Indemnitor to the Indemnitee under this Section 7.04 shall be payable by the Indemnitor (or the Escrow Agent

under the Escrow Agreement) as incurred by the Indemnitee. In the event Indemnitor (or the Escrow Agent under the Escrow Agreement) fails to pay, timely and fully, any such amounts, Indemnitee may pay such Claim. In such event, the Indemnitee may recover from the Indemnitor, in addition to the amount so paid, (i) interest on the amount claimed at the Rate, and (ii) reasonable attorneys' fees in connection with the enforcement of payment under this Section 7.04; provided, however, that in the event the Escrow Agent fails to pay any amounts, the Sellers shall not be liable for any of the foregoing interest or fees or for reimbursing Purchaser if it pays such Claim.

(e)     No Set-Off. The Indemnitee's right to indemnification under this Section 7.04 shall not be subject to set-off for any claim by the Indemnitor against the Indemnitee.

Section 7.05    Assignment by Purchaser. No consent by any party hereto shall be required for any assignment or reassignment of the rights of Purchaser under this Article VII.

## ARTICLE VIII

## GENERAL PROVISIONS

Section 8.01    Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon confirmation of delivery) by delivery in person, by telecopy or facsimile, by registered or certified mail (postage prepaid, return receipt requested) or by a nationally recognized courier service to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.01):

(a)     if to the Sellers generally, c/o Eddings:

James R. Eddings
6416 Dykes Way
Dallas, Texas  75230


with a copy to:

Hallett & Perrin, P.C.
2001 Bryan Street
Dallas, Texas  75201
Attention:  Randall Roberts
Fax:  (214) 922-4170

49

(b)    if to Purchaser:

Theragenics Corporation
5203 Bristol Industrial Way
Buford, Georgia 30518
Attention: Frank Tarallo
Fax: (770) 831-5295

with a copy to:

Powell Goldstein LLP
Fourteenth Floor
1201 W. Peachtree Street, N.W.
Atlanta, Georgia 30309-3488
Attention: Rick Miller
Fax: (404) 572-6999

(c)    if to any individual Seller for a matter
not germane to any other Seller,
to such Seller at the address set forth below
such Seller's name on Schedule 1.

Section 8.02    Rights and Remedies Cumulative.    The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights or remedies that either party may otherwise have at law or in equity.

Section 8.03    Severability.    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.    Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner to the fullest extent permitted by applicable Law in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

Section 8.04    Assignment; Binding Effect; No Third Party Beneficiary.    Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties hereto.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Notwithstanding anything contained in this Agreement to the contrary, other than Article VII, nothing in this Agreement, expressed or implied, is intended or shall be construed to confer on any person other than the parties hereto or their respective successors and permitted assigns any rights or remedies under or by reason of this Agreement.